```
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2
                                      )
3    UNITED STATES OF AMERICA,        )   23-CR-433
                                      )
4                    Plaintiff,       )   Brooklyn, NY
                                      )   November 13, 2023
5                    vs.              )   1:00 PM
                                      )
6    BRADEN JOHN KARONY, aka JOHN     )
     KARONY, et al.,                  )
7                                     )
                     Defendant.
8

9                    TRANSCRIPT OF BAIL HEARING
                BEFORE THE HONORABLE ERIC KOMITEE
10                 UNITED STATES DISTRICT JUDGE

11   APPEARANCES (All present by video or telephone):

12   For the Government:        MATTHEW GALEOTTI, AUSA
                                DREW ROLLE, AUSA
13                              UNITED STATES ATTORNEY'S OFFICE
                                271 Cadman Plaza E
14                              Brooklyn, NY 11201

15   For the Defendant:         ADAM SCHUMAN, ESQ.
                                CAELYN STEPHENS, ESQ.
16                              PETRILLO KLEIN & BOXER LLP
                                655 Third Avenue
17                              22nd Floor
                                New York, NY 10017
18
                                CLAYTON SIMMS, ESQ.
19                              9 Exchange Plaza, #600
                                Salt Lake City, UT 84111
20

21
                          Janice M. Grill
22                           eScribers
                      7227 North 16th Street
23                       Phoenix, AZ 85020
                         www.escribers.net
24
     Proceedings recorded by electronic sound recording; transcript
25   produced by transcription service.
```



1          MR. GALEOTTI:  Mr. Jackson, I believe there may be a

2  number of individuals that are not party to the case that have

3  joined the call.

4          THE CLERK:  Okay.  So all non-parties to this action,

5  please mute your phones.  All non-parties to the action, please

6  mute their phones, and do not leave your cell phones near the

7  telephone.  We get background echo sounds.  Thank you.

8          THE COURT:  Hi, Mr. Jackson.  I'm on.

9          THE CLERK:  Okay.  Before asking the parties to state

10  their appearances, I would like to note the following.  Persons

11  granted remote access to proceedings are reminded of the

12  general prohibition against photographing, recording, and

13  rebroadcasting of court proceedings.  Violation of these

14  prohibitions may result in sanctions, including the removal of

15  court-issued media credentials, restricted entry to future

16  hearings, denial of entry to future hearings, or any other

17  sanctions deemed necessary by the Court.

18          Criminal courts, status conference, docket number 23-

19  CR-433, USA v. Karony.

20          Counsel, please state your appearances for the record,

21  beginning with the Government counsel.

22          MR. MATTHEW GALEOTTI:  Good afternoon, Your Honor.

23  For the Government, Assistant United States Attorney Matthew

24  Galeotti.

25          MR. ADAM SCHUMAN:  For Mr. Karony, Adam Schuman from

```
 1   Petrillo, Klein, and Boxer.  Good afternoon.  I'm joined from
 2   my office by Caelyn Stephens, and in Utah, Clayton Simms, who
 3   has represented Mr. Karony in the proceedings in Utah and is
 4   with Mr. Karony now telephonically in Utah.
 5           THE CLERK:  All right.
 6           THE COURT:  Good afternoon, everybody.  Thank you for
 7   being with us by phone.  I know this case was with Judge DeArcy
 8   Hall in her capacity as the miscellaneous judge last week, but
 9   it is back with me.  And I'm assigned for all purposes as you
10   may know.
11           We are here for argument on the Government's motion to
12   detain the defendant pending trial without bail.  So why don't
13   we hear from the Government first, please.
14           MR. GALEOTTI:  Thank you, Your Honor.  I'd first note
15   that while there are a number of inaccuracies, both
16   procedurally and substantively, that occurred at the hearing in
17   Utah and then in the defendant's filing last night, what I'd
18   like to do first is address in substance the basis for the
19   Government's appeal.  And then only if there are questions from
20   the Court or if it impacts the decision to correct some of
21   those procedural inaccuracies that have been put forth.
22           So let me start, Your Honor, by saying the Government
23   makes this motion pursuant to 18 United States Codes, Section
24   3142(f)(2) because this case, Mr. Karony in particular, it
25   involves a serious risk that he will flee under subsection (a).
```



1   And then, in addition, under subsection (b), there is a serious

2   risk that Mr. Karony will obstruct or attempt to obstruct

3   justice or threaten or attempt to threaten or injure or

4   intimidate perspective witnesses or tamper with evidence.

5           Your Honor, from the Government's perspective, this is

6   a paradigm risk of flight case under the Bail Reform Act.

7   First, the defendant has significant foreign ties.  Second, the

8   defendant has the means to flee.  Third, the weight of the

9   evidence against him is overwhelming.  And forth, given the

10  significant penalties he faces, he has tremendous incentive to

11  flee.  And I can elaborate on each of these.

12          For instance, with respect to his foreign ties, the

13  defendant has essentially resided abroad for the last two

14  years, only coming back to the United States for short stints

15  for serious proceedings such as, in this instance, in which he

16  came back for a civil court case and a memorial service.

17          Even in this instance in which he came back, the

18  defendant had a return flight less than ten days after he

19  arrived in the United States.  For purposes of understanding

20  where the defendant is based, it has for all practical purposes

21  been abroad for the last two years essentially since the

22  conduct at issue in this case has come to light.

23          More worrying, perhaps, is that the defendant most

24  recently spent five months abroad after learning about the

25  Government's continued investigation, including through a



1    subpoena to one of the defendant's co-conspirators.

2          THE COURT:  Well, why doesn't that invalidate your

3    position, that he was aware of the investigation and returned

4    to the U.S. voluntarily?

5          MR. GALEOTTI:  Well, there's two things, Your Honor.

6    The first what I would say is the point about him essentially

7    residing abroad for the last two years is to distinguish Mr.

8    Karony from his codefendants, for example, Thomas Smith, who

9    had ties to the United States and was caring for sick

10   individuals at his home.

11         Mr. Karony essentially, for practical purposes, should

12   be treated as a foreign national given where his base is.  In

13   other words, more of his ties are abroad.  He has incentive to

14   be abroad.  I think what we would say is the incentive

15   structure has changed in this case.

16         So let me give you an example.  Prior to being charged

17   in this case, Mr. Karony told a number of individuals

18   associated with the case that the FBI investigation was dead.

19   He thought that it was not continuing anymore, and he thought

20   there was nothing to worry about.  Nevertheless, given his

21   understanding that things were going on, he essentially moved

22   his operations abroad.  All of that has now changed, and he now

23   has every incentive to flee and, in fact, to continue residing

24   abroad where he has been.

25         So I think the point about him being abroad for the



1    last two years is to say that he's more akin to someone who is

2    charged and brought here from overseas than the other way

3    around.

4          We don't know what would have happened had Mr. Karony

5    understood that the FBI investigation was ongoing at this point

6    or if he understood he was at risk of being charged when he

7    flew back to the United States.

8          Second, it's clear the defendant has the means to

9    flee.  He is a wealthy individual.  Unfortunately, most of his

10   proceeds are crime proceeds that were perpetrated in connection

11   with SafeMoon and essentially his ability to take money from

12   what we call the liquidity pool, the piggy bank for the vault

13   of the SafeMoon crypto currency, and essentially embezzle that

14   money so that he could use it and diverted it for his own

15   purposes, including for travel, including for luxury expenses.

16   But the defendant certainly has the ability to flee.  He has

17   the ties abroad.  He has places to live abroad, and he has done

18   so in the past.

19          THE COURT:  So the indictment --

20          MR. GALEOTTI:  Third, I think we've elaborated on

21   this, but the weight of the evidence against Mr. Karony --

22          THE COURT:  Let me jump in here.

23          MR. GALEOTTI:  Sorry.

24          THE COURT:  If I can, sorry.  And if everybody who's

25   not participating could please mute their phones, I think that

1    might help as we go forward.

2          The indictment talks about withdrawals from the LP

3    account and otherwise, but I don't think nets to a particular

4    dollar figure that you all see being removed.  How much money,

5    and I understand -- let me just preface this all by saying I

6    understand the investigation is continuing.  I understand the

7    Government expects to learn more facts, and these numbers are,

8    of course, subject to change.  But how much money do you see

9    this defendant having withdrawn for himself improperly, in

10   other words, tokens or other value that did not belong to him,

11   in your view?  How much do you see him having improperly

12   diverted to himself?

13         MR. GALEOTTI:  Understood, Your Honor.  I'll try to

14   answer it as directly as possible.  We see over $300 million in

15   money that is investor money that was diverted elsewhere.  With

16   respect to the best we can do to trace money that went in

17   particular to this defendant, it appears to be in the tens of

18   millions of dollars.

19         Now, this is all done through a series of concealed

20   transactions through various cryptocurrency wallets associated

21   with Mr. Karony.  It would be impractical to say at this point

22   that that tracing is complete or even that the Government is

23   aware of all of Mr. Karony's various wallets.  But just given

24   the ones we know, it appears that the three defendants charged

25   in this case, and primarily Mr. Karony, diverted tens of

1    millions of dollars, and we can actually trace his spending

2    through much of that on various items.

3              So unfortunately, Your Honor, at this point, I can't

4    give you a precise number, but we are talking about a number in

5    the tens of millions.

6              THE COURT:  Okay.  And to the extent you have tied

7    various crypto wallets to the defendant, what is the state of

8    the Government's ability to, and I mean Government writ large,

9    not just the Department of Justice, but also the civil

10   authorities, what's the state of the Government's ability to

11   put asset freezes in place as to the wallets you're aware of?

12             MR. GALEOTTI:  I'm a little hesitant to talk about

13   that publicly, Your Honor, given that we do not want our

14   efforts to be thwarted on that front.  We've taken various

15   steps is what I can say.  But nevertheless, given the way money

16   was diverted, given that there is still money in the liquidity

17   pool, there's a concern certainly, Your Honor, despite steps

18   that have been taken by the Government about dissipation of

19   victim assets, and in particular the ability to recover funds

20   for restitution for those victims.

21             So the Government certainly is concerned about those

22   issues and has taken steps in conjunction with other law

23   enforcement authorities.  But by no means can we say that

24   safeguards are in place to ensure that the defendant can no

25   longer dissipate assets and in particular victim funds.



1           THE COURT:  Well, I'm not sure that's -- I understand

2   that you may feel that you're at risk of divulging

3   investigative tools that you'd rather remain secret, but you

4   can't have it both ways.

5           Like in paragraph 1 of your letter, dated November 8,

6   you put front and center really two things, well, three things.

7   One, the amount of money the defendant is alleged to have

8   stolen; two, his significant foreign ties; and three, and this

9   is the culmination of paragraph one, his ability to access

10  digital assets and dissipate victim funds from anywhere in the

11  world.

12          And you know, that, I'm trying to tease out the

13  question of how that matters here and how it doesn't, because

14  on the one hand, you know, if we had a defendant who had robbed

15  a bank, and we thought buried the cash proceeds in a forest

16  somewhere and was highly likely, if released, to go get those

17  funds before law enforcement could figure out where they are

18  and move them, that might, and we've got some legal questions

19  here too, but that might be the kind of obstructive act,

20  concealment of evidence or otherwise that satisfies the

21  dangerousness prong of this analysis.  And I think that's what

22  you're arguing here.

23          But I'm not sure that's a good analogy for this case.

24  This could be closer to the average stock fraud case where if

25  you said, you know, Judge, we need to lock the defendant up



1    pending trial because otherwise he's going to move assets out

2    of banks and broker dealer accounts, I think the proper

3    response from the Court in that circumstance would be, go get

4    an asset freeze and put it in place as to those assets, as

5    opposed to telling the judge that we all have no choice but to

6    lock this person up because we're worried that assets will

7    dissipate.

8         And so I think I do need to know more from you about

9    the state of your ability and the limits on your ability to

10   freeze the assets that you think you're looking for.  How, you

11   know -- have you located what you think is ten percent of the

12   assets that you're looking for, or ninety percent?  That might

13   be a very different picture here in one case or another.

14        I understand you may be hesitant to answer that

15   question.  But if you're asking for the defendant to be locked

16   up pending trial in significant part because of that risk of

17   dissipation of assets, you might need to say something more.

18        MR. GALEOTTI:  I understand, Your Honor.  Let me

19   proceed here by way of example.  There are a number of wallets

20   associated with this defendant that have engaged in the recent

21   months in massive transactions, moving money abroad, and to

22   exchanges abroad.

23        In particular, I can cite a country in Europe that has

24   restrictive banking laws which Mr. Karony has moved his assets

25   through a series of cryptocurrency transactions to an exchange



1    in such country where we lose visibility into those assets and

2    where the ability to freeze or seize such assets is limited.

3    So that is just one example.

4         This is not a case like a standard stock case or IPO

5    case where we can go ahead and reach out to the U.S. banks and

6    ask them to freeze these assets, and they'll be able to be

7    available for the Government to seize at a later date and

8    provide to victims of the case.  We simply can't do that.  Most

9    of the money is going to be hard to recover.  It's not

10   necessarily in the United States.  It's been concealed through

11   a series of transactions, and it's on exchanges that the

12   Government may or may not ever be able to reach.

13        So I understand Your Honor's question, and I want to

14   provide as much as I can.  I think this is the kind of case

15   where whatever steps we take, they will be imperfect as a way

16   to recover this money.  But here, we actually have seen, again,

17   recent months, significant volume transactions moving money

18   abroad to exchanges that the Government may not ever be able to

19   access.

20        THE COURT:  Well, that horse may be out of the barn.

21   I think the question is as to the wallets you still can see and

22   as to which you're worried that if the defendant was released,

23   he could get to them, can you -- you know, is the defendant

24   essentially on the honor system if he is released from prison

25   that he won't move any money through or out of those wallets or

1    to the extent -- I mean, I think some of this money is in U.S.

2    crypto exchanges.  Is that fair or not fair?  Where are they is

3    the question.

4           MR. GALEOTTI:  That is not correct, Your Honor.  And

5    in fact, in this case, we cannot freeze most wallets associated

6    with this defendant.

7           THE COURT:  Why?

8           MR. GALEOTTI:  He has access to them, and we do not,

9    and they are not frozen.

10          THE COURT:  Why can't you freeze assets in crypto

11   wallets -- at all or sometimes?

12          MR. GALEOTTI: Well, for one, most of these are on

13   exchanges and wallets that are operated abroad.  Second, the

14   defendant may have wallets that are not on an exchange so only

15   he would have access to it and not the Government and not a

16   third-party that the Government could push to freeze or to

17   hold, you know, separately.

18          So the two primary reasons are that much of this is

19   abroad, controlled abroad.  These wallets are controlled

20   abroad.  And the second is he may have assets that are just not

21   online so to speak that they can be frozen by a third party

22   over which the U.S. has control.

23          THE COURT:  Okay.  Let me pause on the series of

24   factual questions I'm asking here.  In case it's not obvious

25   already, I am far from any sort of expert in the custody and

1    trading of crypto-related assets.  From a legal perspective,

2    what is the best case for you, ideally a Second Circuit case or

3    Supreme Court, for the proposition that the existence of

4    criminal fraud proceeds or other criminal proceeds that the

5    Government believes are in the defendant's possession that they

6    can't necessarily track down or freeze is a basis for a

7    detention?

8             MR. GALEOTTI:  Yes, Your Honor.  Let me, just since I

9    do have a number here available, let me just put one last fine

10   point on Your Honor's prior question before answering this one.

11   One other example is that there's $1.2 million in a private

12   unhosted wallet, meaning not able to be frozen by a third-party

13   that the defendant currently controls.

14            So to answer Your Honor's question, I need to back up

15   a minute.  I think, Your Honor, we are moving under 3142(f)(2)

16   given that the defendant is a flight risk.  I think what

17   we've -- and you're right.  We need to -- let me back up what

18   we're saying with respect to the dissipation of assets, which I

19   do think is another factor that colors the Court's

20   consideration here.  But we are moving independent of his

21   ability to dissipate the victim funds, and that is just another

22   issue that's at play.  I think one reason we highlighted it is

23   because it does go to the means and ability to flee, which is a

24   factor under 3142(f)(2).

25            So I don't think what we're saying is there's some



1    number or there some court case that says some number of victim
2    funds is too much and therefore the defendant should be
3    detained.  What we're saying is the defendant is a flight risk.
4    He has access to these funds and he has the ability to flee
5    given these funds.  In addition, it's worth noting that he also
6    has the ability to dissipate victim assets.  But I think we're
7    making a slightly separate argument.
8            THE COURT:  Okay.  So then, just turning to the risk
9    of flight, I don't have the bond that was entered in Utah if
10   one was.  Why wouldn't it be the case -- we're starting
11   essentially de novo here anyway, right?  Why wouldn't it be the
12   case that home detention with electronic monitoring, maybe
13   strict conditions about Internet use, and the surrender of
14   passports and maybe some meaningful security from one or more
15   viable and independent sureties, why wouldn't that be
16   sufficient to assure his continued appearance?
17           MR. GALEOTTI:  Yes, Your Honor.  So let me first note
18   that the Government did take that position with respect to
19   codefendant, Thomas Smith.  Here, the difference is Mr. Karony
20   is not similarly situated given his ties abroad.  Mr. Karony's
21   fiancée is abroad.  Mr. Karony had plans to reside abroad.  Mr.
22   Karony has no reason to be in the United States.  As we've
23   outlined, he does not have ties to the United States.  So we
24   don't even believe --
25           THE COURT:  His fiancée's a U.S. or UK citizen?



1          MR. GALEOTTI:  UK, is the Government's understanding.

2     I'm sure that defense will correct us if we're wrong.

3          The Government (sic) no longer has communication with

4     his family that is in the United States and hasn't for some

5     time.  Here, the defendant, Mr. Smith, had a house in New

6     Hampshire that he resided in with his family.  Mr. Karony, on

7     the contrary, has a house in Utah which he was selling.  His

8     ties just aren't here.  He doesn't have a reason to be here.

9          We would argue, Your Honor, that he is more akin to

10    his codefendant, Kyle Nagy, who, in fact, has already fled the

11    United States.  So flight is a serious risk in this case.  In

12    fact, it has already taken place.  And Mr. Karony doesn't have

13    the ties to the U.S. to keep him here, nor does he have

14    suretors in the U.S. that have the moral suasion over him to

15    keep him here.

16          THE COURT:  What do you know -- you mentioned his, I

17    think you said, strained relationship with his family in the

18    U.S.  What is known about the substance of this lawsuit in Utah

19    against his mother, I think?

20          MR. GALEOTTI:  In what respect, Your Honor?  Are you

21    asking me for the substance of that civil suit?

22          THE COURT:  Yeah, what was it about?

23          MR. GALEOTTI:  Your Honor, not -- I don't pretend to

24    be an expert on that issue.  But certainly, what we understand

25    is that it's over various intellectual property and other



1    business issues related to entities other than SafeMoon.

2                THE COURT:  Can you say what kind of IP?

3                MR. GALEOTTI:  Your Honor, I'm going to defer to Mr.

4    Rolle, co-counsel for the government on this question.

5                MR. DREW ROLLE:  Good afternoon.  This is Drew Rolle

6    for the record.  Your Honor, I think our understanding of it is

7    limited.  But in part, just from our discussions with counsel

8    for the receiver, the company, Emanation Communications Group,

9    was involved in the construction and deployment of technology,

10   like windmill and communications technology on the continent of

11   Africa, I think, including specifically in The Gambia.  So I

12   think there's intellectual property interest in certain patents

13   either that they've applied for or technology that they have

14   got patents on and materials that they put together.  So I

15   think that's part of the assets.

16                It's unclear what hard assets or other assets remain

17   at the entity.  But our understanding from the receiver is that

18   there is technically, and it's kind of a Utah equivalent of, a

19   liquidation, and they will all be auctioned off.  And the

20   defendant was in the process of attempting to acquire those

21   assets through the receivership process, which he personally

22   funded with the 800-plus thousand dollars that he transferred

23   to the receiver.  But I think that's as much background as we

24   understand it.  I think there is a complicated procedural

25   history in the case, but they are nearing a point where they

1    are trying to liquidate those assets and --

2              THE COURT:  But can you say anything about just the

3    basic nature of the business relationship between the defendant

4    and his mother with the recent litigation because I think --

5              MR. ROLLE:  Yes, Your Honor.

6              THE COURT:  -- correct me if I'm wrong, let me just

7    tee up one more sentence here.  Correct me if I'm wrong, but I

8    thought in reading the transcript of the proceedings before the

9    magistrate judge in Utah that defense counsel out there had

10   indicated that both of the defendant's parents were employees

11   of the CIA.

12             MR. ROLLE:  Yes, Your Honor.  We understand that at

13   least one of the parents, I think the father, worked for the

14   CIA at some point.  This is -- but has since left the agency,

15   and this is a private business that they started and a venture

16   that they operated in a personal capacity after that point.

17             And that entity was in operation in 2021, and it was

18   in that time frame that the defendant, after the creation of

19   SafeMoon, made the five million -- bought a stake in the

20   company for 5 million dollars.  And then, from that point on,

21   there was an understanding that there was a falling out in the

22   family between them in relation to that business, the

23   defendant's involvement in the business including, we

24   understand, statements that he made regarding the company's

25   technology and whether that company -- whether the company's

1       technology could be used to benefit SafeMoon in some way is the

2       broad strokes of what we understand about sort of the fallout

3       that happened.

4              And it culminated in a lawsuit that the defendant

5       filed against his parents and the company related to their

6       alleged mismanagement of the Emanation Communications Group and

7       that the company was being mismanaged, and he sued them as part

8       of that process.

9              That ultimately, I think, is what has led to the

10      receivership.  So that's the nature of the case that he brought

11      against his parents.  I think the proceedings in Utah

12      accurately reflect that he has an estranged relationship with

13      the family owing at least in part to the lawsuit that he filed

14      against them.

15             THE COURT:  Okay.  All right.  Can I hear from Mr.

16      Schuman on behalf of the defendant, please?

17             MR. SCHUMAN:  Thank you, Judge.  Good afternoon.

18             THE COURT:  Good afternoon.

19             MR. SCHUMAN:  Starting with risk of flight, we submit

20      that the Government has not met its burden.

21             THE COURT:  Can you start with --

22             MR. SCHUMAN:  Beginning with proposed --

23             THE COURT:  -- sorry to cut you off.  But what is it

24      you're proposing in terms of sureties, security, and release

25      conditions?



```
1          MR. SCHUMAN:  Judge, the order in Utah is basically
2   consistent with what you were reciting earlier as your sort of
3   de novo potential inclination, which is home detention.
4          Mr. Karony does rent an apartment in Miami.  He would
5   have home detention in Miami, which is what the Utah bail order
6   provides.  His fiancée is a UK citizen, but she would come and
7   be in Miami with him.  Obviously, travel to Brooklyn is
8   required for this matter.  He --
9          THE COURT:  How long would she be admitted for, do you
10  believe?
11         MR. SCHUMAN:  I don't know.  But we would make
12  whatever arrangements are feasible.
13         THE COURT:  And Miami, I gather from reading the
14  transcript from Utah, that the Miami residence is a rental.  Is
15  that prepaid?
16         MR. SCHUMAN:  It --
17         THE COURT:  How would you -- prepaid for how long?
18         MR. SCHUMAN:  I don't know and it could be and if it
19  sways the Court in some way, if you prefer, we could
20  investigate having him rent an apartment in the New York
21  metropolitan area so he's closer to counsel and closer to the
22  court.
23         THE COURT:  Well, to me, the question about the rental
24  is how will he pay the rent other than through the use of ill-
25  gotten gains?
```



1          MR. CLAYTON SIMMS:  This is Clayton --

2          UNIDENTIFIED SPEAKER:  Judge --

3          MR. SIMMS:  -- in Utah.  David Nagellan (ph.), the

4    attorney for SafeMoon, he said the apartment's prepaid.

5          THE COURT:  All right.  Who's talking there?  We need

6    to go one lawyer at a time, and I was posing that question to

7    Mr. Schuman.

8          MR. SCHUMAN:  Right.  Judge --

9          THE COURT:  If you want to turn it over to someone

10   else.

11         MR. SCHUMAN:  This is Adam Schuman.  I don't know but

12   let me just also point out as you may appreciate to some

13   extent, Mr. Karony's been detained for now almost two weeks in

14   Utah.  It's been virtually impossible for me to have direct

15   contact with him during this time.  He has had Mr. Simms in

16   Utah, who is physically with him now, whom Mr. Simms was going

17   to comment on your last question, assisting Mr. Karony with the

18   proceedings there.  We're trying to coordinate here.

19         And the fact that, not to harp on it, but the fact

20   that there have been repeated stays and continuances since the

21   detention has meant that for two weeks it's prejudiced Mr.

22   Karony's ability to have counsel to coordinate on the types of

23   questions you're raising.

24         But to the extent we're able to meet, and we were able

25   to meet, or thought we were able to meet, the magistrate

1    judge's order, he was going to comply with that.  To the extent

2    you set reasonable conditions so that he'll appear, we'll take

3    efforts to meet that.  And if it's all right with the judge, it

4    may be that Mr. Simms has additional factual information to

5    answer your question.

6            THE COURT:  Yeah.  I'm happy to hear from Mr. Simms,

7    and I also am interested in the question of -- I now have a

8    copy of the bond in front of me, and I may not be reading it

9    precisely because it doesn't look exactly like the bonds we

10   have here in the Eastern District of New York.  But I don't

11   see any solvent sureties identified or any property posted as

12   security.  And what I was posing what I thought were kind of my

13   stalking horse proposal for what might or might not, but what I

14   wanted to debate to assure the continued appearance of the

15   defendant, I had meant to include that if I did not, although I

16   think I did.  So Mr. Simms?

17           MR. SIMMS:  Judge, the Utah order was to execute the

18   bond within fourteen days of release.  The difficulty in the

19   defendant making phone calls out, they have been extreme.  And

20   unfortunately, despite the fact that he had funds on his

21   account in Utah, he was unable to make jail calls because, and

22   I won't bore the Court with the technical difficulties with

23   making phone calls out of the Salt Lake County Metro jail, but

24   he was unable to make phone calls.  And so the Court said that

25   he could execute that bond within fourteen days.

1          THE COURT:  Okay.

2          MR. GALEOTTI:  Your Honor, Matthew --

3          THE COURT:  Let me, yeah, Mr. Galeotti.

4          MR. GALEOTTI:  If I can just correct, Your Honor.  So

5    essentially, the bond that's been entered in Utah, irrespective

6    of when it would be signed, is a personal recognizance bond.

7    Your Honor has read it correctly.  There's no suretors.

8    There's no amount of money.  There's nothing in there that has

9    suasion over him.  So you're reading the bond --

10          THE COURT:  Just let me put this out there now, and

11   I'll give Mr. Schuman and his co-counsel in Utah the final word

12   here, it is not obvious to me, as I sit here right now, that

13   there is no condition or combination of conditions that would

14   assure Mr. Karony's continued appearance in this case.  But

15   those conditions have not materialized yet; it seems fairly

16   clear to me.

17          The proposal, as I understand that, would have Mr.

18   Karony living in a rental apartment in Florida.  There's a

19   proffer from defense counsel that some rent on that apartment

20   is prepaid, but we don't know how much, or at least I don't

21   know how much, having not heard it yet here today.  Mr.

22   Karony's fiancée is a UK citizen.  She, it is proffered, would

23   come here, but we don't know at this point for how long she

24   would be able to remain in the country with the defendant.

25          And this is, it seems utterly clear, a person with

1     access to substantial amounts of money based on the

2     Government's proffer.  We're talking about money that it would

3     be potentially easy for the defendant to access, but hard for

4     the Government to trace or track.  And we don't have any of the

5     moral suasion that would be associated with meaningful security

6     posted by solvent sureties who have the kind of relationship

7     with the defendant that would bring the moral suasion that I

8     think we all would want to see.

9           And so where I am now is, I'm happy to consider a

10    stronger package if and when one materializes.  But at this

11    point, on the table in front of me, there are no proposed

12    conditions or combination of conditions that, in my view, would

13    assure the defendant's continue appearance in this case.

14          MR. SIMMS:  Judge, if I might say, a unique feature of

15    Utah, we -- this is Clayton Simms on the line.  The Court

16    didn't know how to fill out a bond.  That's not something that

17    happens in Utah.  And so some of that absence of documentation

18    on that bond is just a matter of --

19          THE COURT:  But the concept of -- let me just jump in

20    there.  The Bail Reform Act refers in its text to solvent

21    sureties and the potential for security.  And there is a --

22    this may not be a Utah form of bond, although it says District

23    of Utah at the top of it.  But it also has a place for property

24    that is going to be posted, and it is to be described above,

25    and all that is empty.

1          MR. SCHUMAN:  Judge --

2          THE COURT:  It probably just was an oversight

3   presumably.

4          MR. SCHUMAN:  Judge, if I may, it's Adam Schuman.

5          THE COURT:  Yes.

6          MR. SCHUMAN:  Just a few points.  One, again, hurdles

7   exist here, which compared to Mr. Smith, for example, who

8   apparently was allowed to surrender, at least to appear from

9   New Hampshire to Brooklyn without being incarcerated, our

10  client was allowed prior to being arrested to come into the

11  United States through Miami, to fly to Utah where it appears he

12  decided to fly to Utah, as the Government points out, and they

13  arrested him there.  They knew apparently why he was flying

14  there.  And it's made it difficult.  He does, as the Government

15  has pointed out, have a house.  We can post the house.  Mr.

16  Smith was allowed out --

17         THE COURT:  -- the Government alleges that I think --

18  when was the house purchased?

19         MR. SCHUMAN:  It's Mr. Schuman.  I don't know.  The

20  Government may know.

21         THE COURT:  I mean, my question is about whether the

22  Government would take the position that the house, whatever

23  equity in the house exists, represents the proceeds of the

24  scheme at issue here.

25         MR. SCHUMAN:  In terms of timing, I'd also point out,



1    Your Honor, that the indictment, according to its allegations,

2    the charges ended in June 2022, which is well more than a year

3    ago.  My client has been allowed to travel in and out of the

4    United States.  Whatever's happened with whatever alleged

5    assets has continued since that time, and he's now being

6    significantly prejudiced.

7             And we can -- obviously, we'll comply with whatever

8    your order and conditions are, but it's much more practical, I

9    submit, to allow Mr. Karony to travel back to the East Coast on

10   a package which has been supplemented in some prompt time frame

11   similar to what it seems the magistrate judge contemplated in

12   Utah with additional sureties rather than have him incarcerated

13   during that period, which will make it difficult.  And it's

14   already prejudiced his defense and ability to consult with

15   counsel.

16            MR. GALEOTTI:  Your Honor, if I may, for the

17   Government, just three points to correct that I do think are

18   relevant.

19            First, the Defendant was arrested within hours of the

20   indictment being returned given the concern regarding the

21   defendant's ability to flee.  So I'm not sure where the rest of

22   those points are coming from.  But the same day that the grand

23   jury returned the indictment, this defendant was arrested.

24            Number two, if you look at the forfeiture allegations

25   on page 26 of the indictment, the home in Utah, as Your Honor

1    suggested, is in fact, in paragraph 67B, the defendant's

2    property in Utah is subject to forfeiture.

3              And third, Your Honor, we would say the appropriate

4    course of action is for that defendant to be -- a permanent

5    order of detention should be entered.  The defendant should be

6    removed in custody without leave to renew his bail package at

7    such time as potentially one is presented that's appropriate.

8    That time is not now.  That time has not come.  And so the

9    defendant should be removed in custody to face proceedings in

10   New York.

11             THE COURT:  When you say --

12             MR. SCHUMAN:  Your Honor, Adam Schuman.  Sorry.

13             THE COURT:  Mr. Galeotti, did you say without leave to

14   propose a renewed bail package when he arrives here or with

15   one?

16             MR. GALEOTTI:  I'm sorry, without prejudice, Your

17   Honor, to propose a new package when he arrives.

18             THE COURT:  Yeah.  That's where I think we all are.  I

19   take Mr. Schuman's point as well made that there's a little bit

20   of a chicken and egg problem in the fact that the defendant is

21   currently detained in a place where his communications are

22   somewhat limited and that that can inhibit his ability to

23   communicate with counsel and to put together a satisfactory

24   bail package.  But for better or for worse, that is the way

25   these things often unavoidably work.

1          And so I am ordering now -- well, first of all, I

2    should have asked at the outset of this proceeding, Mr. Karony,

3    can you hear what I'm saying clearly?

4          THE DEFENDANT:  Yes, Your Honor, I can hear you.

5          THE COURT:  Okay.  And I know you're lawyer

6    represented, but you're there with him.  But yeah, if there's

7    anything you haven't heard or understood clearly, let him know

8    that, and I will go over it for you again.

9          But with that having been said, it seems very clear to

10   me that, yeah, the limited conditions that have been offered to

11   date and that were the subject of the magistrate judge's order

12   in Utah are insufficient to assure the defendant's continued

13   appearance in this case.

14         Having said that, I do want to make clear that there

15   could be a package of conditions that would lead me to a

16   different conclusion if we were talking about solvent and

17   viable sureties who had a relationship of potential moral

18   suasion with the defendant and who were willing to post

19   property to assure his continued appearance and his continued

20   compliance with all of the conditions of his release.  But we

21   simply are not there yet.

22         And so I order Mr. Karony to be detained pending his

23   removal or extradition, whatever we would call it, to the

24   Eastern District of New York.  I will be happy to revisit this

25   conclusion in the context of a more robust proposed bail

1    package if and when that day comes.

2              Thank you all.  And with that, we will be adjourned.

3    The Court's deputy will reach out about scheduling a status

4    conference for a point shortly after the defendant's arrival

5    here, and we will look to see you all in person relatively

6    soon.  Thank you all, and with that, we will be adjourned.

7              MR. GALEOTTI:  Thank you, Your Honor.

8              MR. SCHUMAN:  Thank you.

9              (Proceedings concluded at 1:40 o'clock, p.m.)

10                              *  *  *  *  *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3           I, Janice M. Grill, court-approved transcriber, do

4    hereby certify the foregoing is a true and correct transcript

5    from the official electronic sound recording of the proceedings

6    in the above-entitled matter.

7

8

9

10

November 13, 2023

11    _____          _____

12    Janice M. Grill                          DATE

13

14    eScribers, LLC
      7227 North 16th Street
15    Phoenix, AZ 85020
      www.escribers.net
16

17

18

19

20

21

22

23

24

25