**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Crim. Case No. 23-cr-433-EK |
| BRADEN J. KARONY, et al., | |
| Defendants. | |

**BRADEN J. KARONY'S MOTION TO DISMISS THE INDICTMENT AND
MEMORANDUM IN SUPPORT**

Nicholas Smith
1123 Broadway, Ste. 909
New York, NY 10010
917-902-3869
*Counsel for Braden J. Karony*

# Table of Contents

I.    The Indictment .................................................................................................... 1

    A.    The Pre-Karony period of SafeMoon development ................................. 2

    B.    Karony "joins the SafeMoon project" ..................................................... 4

    C.    "Seeding" of the BitMart centralized exchange ..................................... 8

II.   Argument ............................................................................................................. 9

    A.    Standard for a Rule 12(b) motion to dismiss an indictment .................... 9

    B.    Count One, charging securities fraud conspiracy, should be dismissed ...... 10

        1.    Elements of securities fraud conspiracy ...................................... 10

        2.    Count One is impermissibly extraterritorial ............................... 10

        3.    SFM tokens are not "securities" under § 78j(b) .......................... 15

            a)    § 78c(a)(10)'s text explicitly excludes currencies ............. 16

            b)    SafeMoon/PancakeSwap were not like an orange grove ...... 20

        4.    Fair warning and lenity ............................................................... 25

    C.    Count Two, charging wire fraud conspiracy, should be dismissed .......... 28

        1.    Elements of wire fraud conspiracy .............................................. 28

        2.    Count Two is impermissibly extraterritorial ............................... 28

    D.    Count Three, charging money laundering conspiracy, should be dismissed ... 30

        1.    Elements of money laundering conspiracy ................................... 30

        2.    Count Three fails to properly allege Specified Unlawful Activity ... 31

Conclusion ................................................................................................................ 32

Braden J. Karony, by counsel, moves the Court to dismiss Counts One through Three of the Indictment, pursuant to Federal Rule of Criminal Procedure 12(b).

Count One, charging securities fraud conspiracy, fails to state an offense, as the digital token at issue is not a "security" and the charge is impermissibly extraterritorial. Count Two, charging wire fraud conspiracy, is likewise impermissibly extraterritorial. As a result, Count Three, charging money laundering conspiracy, fails to allege a specified unlawful activity. For these reasons and others, the counts should be dismissed.

## I.    The Indictment

On October 31, 2023, the government filed the Indictment, charging Karony and co-Defendants Kyle Nagy and Thomas Smith with: (1) conspiracy to employ manipulative devices and contrivances in the sale of a security, in violation of 18 U.S.C. § 371 and 15 U.S.C. §§ 78j(b) and 78ff; (2) conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349; and (3) conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). Indictment, ECF No. 1.

On or about March 1, 2021, Nagy minted one quadrillion SafeMoon tokens (SFM) on the Binance Smart Chain (BNB Chain). Indictment, ¶ 27. SFM was a decentralized finance digital asset, i.e., an asset using distributed ledger or blockchain technology. *Id.*, ¶ 5. That meant transactions in SFM were recorded on a decentralized system using cryptography, rather than by a centralized authority like a bank or government. *Id.* At the time of SFM's initial minting, it was available for acquisition on the BNB Chain. *Id.*, ¶ 9. As the Indictment alleges, it was the BNB Chain that recorded, "among other things, the date and time of the transaction, the unique digital-asset wallet addresses associated with the transaction and the amount of the digital asset involved in the transaction," i.e., the facts that determine irrevocable liability and title transfer. *Id.*

The Indictment does not allege that SFM had any present tangible use beyond its potential

1

to appreciate, such as granting the user access to a particular service or product or an ownership interest in a corporate entity.  Indictment, ¶¶ 1-68.

A.      The pre-Karony period of SafeMoon development

As part of the minting process, Nagy received the SFM into a wallet publicly referred to as the "SafeMoon Protocol: Deployer" ("SFM Deployer Wallet"), which he owned and controlled. Indictment, ¶ 27.  Between March 1, 2021 and mid-March of that year (the "Pre-Karony Period"), Nagy took steps to market SFM and make it available for sale.  *Id.*, ¶¶ 27-34.  The Indictment does not allege that Karony was involved in, or aware of, Nagy's actions during the Pre-Karony Period; it alleges that Karony did not "join the SafeMoon project" until "mid-March 2021." *Id.*, ¶ 35.  The Indictment does not allege that Nagy agreed with any other person to take these actions during the Pre-Karony Period.  *Id.*, ¶¶ 27-34.  It does not allege that Nagy is a U.S. national or that he pursued these actions within the United States.[1]

One of Nagy's steps in the Pre-Karony Period was to make 777 trillion SFM tokens available for sale on March 2, 2021, on "a digital-asset offering service." Indictment, ¶ 27.  The electronic service to which the Indictment refers is PancakeSwap.  The Indictment does not allege that PancakeSwap is a domestic concern.[2] It does not allege that PancakeSwap was hosted on servers located in the United States.

Another of Nagy's steps in the Pre-Karony Period was to set up a SFM liquidity pool. Decentralized finance tokens can rely on liquidity pools to supply liquidity to the market for a

---

[1] Karony understands that Nagy is a Canadian national who resided in Canada throughout the period of the Indictment.

[2] PancakeSwap is a foreign business whose offices are located in Japan.  PancakeSwap, https://docs.pancakeswap.finance/v/japanese.  *See SEC v. Karony et al.*, 23-cv-8138-RML, ECF No. 1, p. 2.

2

particular token.  Indictment, ¶ 12.  The pool is a collection of paired digital tokens (e.g., Token A and Token B), and these collections in turn supply liquidity to traders who want to exchange or swap one of the tokens for the other, e.g., exchanging Token A for Token B or vice versa.  *Id.*  Token swaps in the liquidity pool are typically managed by a type of "smart contract"[3] code known as an automated market maker and not by human operation.  The price of the tokens in a pool is set automatically and is a function of the ratio of the two tokens in the pool.  *Id.*  For certain liquidity pools, the token pairs can be added to the pool by any user who wants to add liquidity.  For each such deposit, the depositor receives unique "liquidity pool tokens" ("LP tokens") that act as a receipt.  The holder of LP tokens can redeem them from the liquidity pool.  *Id.*, ¶ 13.

In the Pre-Karony Period, Nagy funded the initial SFM liquidity pool with 63 trillion SFM and 61.74 Binance Coin (BNB), which is another digital token native to the Binance blockchain.  Indictment, ¶ 28.  An initial set of 1,972 SFM LP tokens were thereby generated.  *Id.*

Also in the Pre-Karony Period, Nagy began marketing SFM to users through "a series of websites and white papers"[4] that he "owned and controlled." Indictment, ¶ 29.  These marketed SFM as a "safe" investment because, "among its other features SFM relied on 'locked' liquidity pools, which allowed investors to transact in SFM more easily, reduced SFM's price volatility and protected SFM investors from fraudulent 'rug pulls'[5] by SFM's developers." *Id.*  In this period,

---

[3] "Smart contracts" refers to computer code on the blockchain, not to contract law concepts.  Indictment, ¶ 10.

[4] In the digital asset community, a "white paper" is "understood . . . to be a comprehensive document outlining the technical and economic aspects of a specific digital asset." Indictment, ¶ 17.

[5] "Rug pull" is a "colloquial term used to describe a scheme in which an issuer of digital assets solicits funds from protective digital asset investors promising them certain benefits, and, once the purchasers' funds are used to purchase the digital asset, the developers abruptly abandon the project and fail to deliver the promised benefits while fraudulently retaining the purchasers' funds." Indictment, ¶ 15.

Nagy also implemented and promoted a SFM "tax": transactions in SFM would automatically be subject to a 10% tax, meaning, for example, that if a SFM holder transferred 10 SFM to another user, 1 SFM would automatically be retained from the transfer as a "tax," and the remaining 9 SFM would be received by the other party. *Id.*, ¶¶ 19, 29. The first 5% would be "auto-locked" in the liquidity pool "for life." *Id.*, ¶ 29. The second 5% of the tax would be "reflected" back to, and distributed among, all SFM holders, in proportion to their current SFM holdings. *Id.*, ¶ 20. Thus, holders would see their SFM balance automatically increase each time any user transferred SFM. *Id.*

In the first two days of SFM trading, Nagy acquired over 21 trillion SFM using the SFM Deployer Wallet. Indictment, ¶ 31. As the market acquired SFM, the SFM tax added tokens to the SFM liquidity pools, generating SFM LP tokens. These were received by the SFM Deployer Wallet and were "distinct from the SFM LP tokens NAGY had locked in a separate smart contract on March 2, 2021." *Id.*, ¶ 32.

Between March 5 and 25, 2021, Nagy transferred more than 10 trillion SFM and 440 BNB obtained through liquidity pool removals to wallets he personally controlled. Indictment, ¶ 34.

### B.    Karony "join[s] the SafeMoon project"

Subsequent to the preceding events, Nagy recruited co-defendants Karony and Thomas Smith to "join the SafeMoon project." Indictment, ¶ 35. Karony assumed the title of CEO of SafeMoon. *Id.* The Indictment does not allege that Karony performed this work domestically.[6] SFM's trading volume and market capitalization grew rapidly in March and April 2021. Although it alleges that SFM would ultimately have "more than two million holders," the Indictment does not

---

[6] Karony worked from London, United Kingdom, where he had resided for years and where his fiancée, a British citizen, resides.

allege to what extent, if any, its growth was attributable to U.S. holders of SFM.[7]  *Id.*, ¶ 8.

The Indictment does not allege that the SafeMoon company had any offices or employees in the United States.  It does not allege that any SFM users acquired the token from the Eastern District of New York.

The Indictment alleges that, after Karony joined SafeMoon, its websites and white papers "continued" to reference "automatically locked liquidity," even though Nagy was removing tokens from the SFM liquidity pools.  Indictment, ¶ 36.  After Karony's arrival in mid-March, the Defendants participated in livestreamed SafeMoon video calls called "Ask Me Anything" (AMA) sessions, where they would communicate with current and prospective SFM holders.  *Id.*, ¶ 35.  The Indictment alleges that all the Defendants "claimed falsely that they were not personally holding and trading SFM." *Id.*, ¶ 38.  However, it only alleges such representations from Nagy and Smith, not Karony.  *Id.*  With respect to Karony, the Indictment alleges that he informed Smith on March 13, 2021 that he "technically" held no SFM, but "hypothetically" held "less than 100" SFM, *id.*, ¶ 40, valued at approximately $50 at the time.[8]

On March 16, 2021, Nagy asked Karony, "[S]hould we be honest with the team about pulling out of the LP for the project for now," to which Karony responded, "lets draft up a statement.  Thomas you and I need to talk about how to message properly." In a conversation with Smith the same day, Karony proposed "updating" the SafeMoon white paper "and call it a day." Indictment, ¶ 42.  The Indictment alleges that, despite these conversations, the Defendants did not

---

[7] Such nationality tracing would be difficult, if not impossible, given that crypto wallet names do not betray IP addresses.

[8] The Indictment alleges that, on one occasion, Karony and Smith discussed the possibility of personally profiting from SFM's increasing value by selling $10,000 worth of SFM from the SFM Deployer Waller each day.  Indictment, ¶ 41.  But it does not allege that Karony ever followed through with the idea.

disclose, at that particular moment, to SFM users their "intent to use funds from the SFM liquidity pool." *Id.*, ¶ 43.

By early April 2021, "hundreds of thousands of investors held SFM." Indictment, ¶ 44. During an April 4, 2021 AMA, Smith told users that SFM was "not a rug pull" or a "soft rug pull." Smith dismissed claims that he personally held SFM. *Id.*, ¶ 45. SafeMoon's social media pages repeated Smith's claim that he owned no SFM tokens. *Id.* Later that day, however, Nagy transferred SFM to one of Smith's wallets, which was traceable to the SFM liquidity pool and valued at more than $600,000 at the time. *Id.*, ¶ 46. Similarly, on April 5 and 9, 2021, Nagy and Smith transferred more tokens from the SFM liquidity pool to themselves. *Id.*, ¶¶ 47-49.

The Indictment does not allege that Karony was aware of, or participated in, any of these transfers.

On April 20, 2021, following Nagy and Smith's liquidity pool transfers, a social media account posted a "scam alert" concerning SFM, claiming that the owners of the SFM smart contract "could pull LP and sell tokens, creating a rug pull." Indictment, ¶ 50. Co-Conspirator 1 told the Defendants that this news upset current and prospective SFM users and there was a "crash incoming." *Id.*

On April 21, 2021, Karony posted responses on Twitter:



6



IF YOU WATCHED OUR AMA'S, YOU WOULD HAVE
KNOWN THAT THE LP IS A LAST RESORT, AND WE
WILL PUBLICLY GO TO THE COMMUNITY AND LET
YOU KNOW IF THE LP WILL BE USED AND WHAT
FOR, AHEAD OF TIME. #SAFEMOON

8:09 AM · Apr 21, 2021



WE ARE FOCUSED ON THE FUTURE, AND
UNDERSTAND THAT SITUATIONS ARISE WHICH MAY
REQUIRE THE USE OF THE LP. USES INCLUDE:
SEEDING OTHER EXCHANGES AND DEX'S,
DEVELOPMENT COSTS OF FUTURE SAFEMOON
INNOVATIONS.

8:09 AM · Apr 21, 2021

Thus, the Indictment alleges that Karony disclosed to users that the SFM liquidity pools

could be used to, among other things, "SEED[] OTHER EXCHANGES AND DEX'S

[decentralized exchanges]" and "DEVELOP[] . . . FUTURE SAFEMOON INNOVATIONS."

Indictment, ¶ 51.  In an April 21, 2021 AMA, Karony stated,

> [W]e understand that situations may require the use of the LP.  Uses can include seeding other
> exchanges creating more backbones as well as in the last resort for development
> costs.  But that is only—honestly, we haven't had a need, and we don't foresee a need, you
> know, in the future.  So, if you watched our other AMAs, you would have known, uh, that
> the LP is a last resort, and we have publicly—Sorry.  Basically, I'm gonna sum it up.  I'm
> not gonna read the rest of these [aforementioned] tweets.  Um, basically if we are gonna do
> something with the LP we'll tell you even if it includes locking it away we usually do about
> once a week but we let you know when we do it. Thomas.

Indictment,  ¶ 52.

7

Between May 6, 2021 and September 2, 2021, Smith used a wallet address he owned and controlled to remove liquidity from the SFM liquidity pool on at least 18 occasions.  Indictment, ¶¶ 54-55.  The Indictment does not allege that Karony participated in, or was aware of, these transactions.  *Id.*

### C.    "Seeding" of the BitMart centralized exchange

During the Karony period of the Indictment, the Defendants "successfully listed SFM with Crypto Exchange 2, a centralized digital-asset exchange . . ."  Indictment, ¶ 57.  The Indictment does not allege that Crypto Exchange 2 is located within the United States.[9]

As a centralized exchange, Crypto Exchange 2—unlike with transfers of SFM over the blockchain—would not automatically provide SFM users the reflections and liquidity pool additions funded by the 10% tax.  Indictment, ¶ 57.  Pursuant to agreements executed in April 2021, SafeMoon agreed to provide Crypto Exchange 2 with SFM to be distributed as "reflections" on Crypto Exchange 2.  *Id.*, ¶ 58.  The Indictment adds,

> As to liquidity pool additions, Crypto Exchange 2 agreed to send specific quantities of stablecoins to SafeMoon that were intended to be swapped for SFM and deposited into the SFM liquidity pool.  KARONY, SMITH and others marketed these features to current and prospective investors.

Indictment, ¶ 58.

However, the Indictment does not allege that the centralized Crypto Exchange 2 in fact had, or could maintain, a "SFM liquidity pool" into which the stablecoin transfers from Crypto Exchange 2 could be deposited, similar to the liquidity pools on PancakeSwap, the decentralized exchange.[10]  Nor does the Indictment allege any statement to SFM users from Karony, or any other

---

[9] Crypto Exchange 2 is the BitMart Exchange, which is headquartered in Grand Cayman.  The BitMart employees with whom the Defendants dealt were based in China.

[10] The government is mistaken.  BitMart, a centralized exchange, had no need for an automated market maker.

Defendant, in which they represent that any transactional gains from the seeding of a centralized exchange like BitMart, much less all of them, would be "deposited into the SFM liquidity pool [on the decentralized exchange]."

Between April 21, 2021 and May 21, 2021, the Indictment alleges that Karony "misappropriated" more than $8 million in stablecoin transfers from Crypto Exchange 2 which allegedly "were supposed to be swapped for SFM and deposited into the SFM liquidity pool." Indictment, ¶ 59. The Indictment does not allege when or where Karony, or anyone affiliated with SafeMoon, represented to SFM users that these stablecoin transfers would be deposited into a SFM liquidity pool unaffiliated with Crypto Exchange 2.

Although the Indictment alleges that, on or about May 13, 2021, Karony and Smith directed Crypto Exchange 2 to transfer approximately $8,542,217 worth of stablecoins to an address they controlled at Crypto Exchange 2, and thereby "misappropriated" the funds, it does not allege that Karony personally profited or benefitted from them. Indictment, ¶ 62(p).

## II.    Argument

### A.    Standard for a Rule 12(b) motion to dismiss charges based on an indictment defect

"[T]he indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged . . ." Fed. R. Crim. P. 7(c)(1). A defendant may move to dismiss charges on the basis of a "defect in the indictment or information," including a "lack of specificity" and a "failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(iii),(v). The indictment must "fairly inform[] a defendant of the charge against which he must defend" and "must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged." *Hamling v. United States*, 418 U.S. 87, 117-18 (1974).

When an "element of the offense is implicit in the statute, rather than explicit, and the indictment tracks the language of the statute and fails to allege the implicit element explicitly, the indictment fails to allege an offense." *United States v. Foley*, 73 F.3d 484, 488 (2d Cir. 1996).

**B.    Count One, charging securities fraud conspiracy, should be dismissed**

**1.    Elements of securities fraud conspiracy**

In both civil and criminal cases brought under Section 10(b) of the Securities Exchange Act of 1934 (the Exchange Act), the government must "'prove that in connection with the purchase or sale of a security the defendant, acting with scienter, made a material misrepresentation (or a material omission if the defendant had a duty to speak) or used a fraudulent device.'" *United States v. Vilar*, 729 F.3d 62, 88 (2d Cir. 2013) (quoting *VanCook v. SEC*, 653 F.3d 130, 138 (2d Cir. 2011)).

However, there are differences between civil and criminal Section 10(b) cases when it comes to certain elements.  In a criminal case, the government need not prove "reliance," i.e., that the victim in fact relied upon the alleged device, scheme, or practice in purchasing or selling shares of the alleged listed securities.  *Vilar*, 729 F.3d at 88.  On the other hand, unlike in civil cases, the government must prove that a criminal defendant willfully violated the law.  *Id.* (citing 15 U.S.C. § 78ff(a)); *see also United States v. Kaiser*, 609 F.3d 556 (2d Cir. 2010) (defining "willfully" in the context of § 78ff(a)).

To prove a conspiracy under § 371, meanwhile, the government must show (a) an agreement between two or more persons to commit [securities fraud] and (b) an overt act by at least one of the participants in furtherance of that agreement.  *United States v. Archer*, 671 F.3d 149, 154 n. 1 (2d Cir. 2011).

**2.    Count One is impermissibly extraterritorial**

In the context of international criminal conduct, one "implicit element" (*Foley*, 73 F.3d at

10

488) that the government must allege in the indictment is either that the criminal statute at issue applies extraterritorially or that the charged scheme is sufficiently domestic. *E.g.*, *United States v. Cornelson*, 609 F. Supp. 3d 258, 264-65 (S.D.N.Y. 2022) (conducting extraterritoriality analysis at the motion-to-dismiss phase).

As the Court knows, in *Morrison v. National Australia Bank Ltd.*, the Supreme Court held that "Section 10(b) [of the Exchange Act] reaches the use of a manipulative or deceptive device or contrivance only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States." *Morrison*'s rule applies in criminal cases and means a criminal defendant may be convicted of securities fraud only if he has "engaged in fraud in connection with (1) a security listed on a U.S. exchange, or (2) a security purchased or sold in the United States." *Vilar*, 729 F.3d at 67. The extraterritorial reach of an ancillary offense like aiding and abetting or conspiracy is coterminous with that of the underlying criminal statute. *United States v. Hoskins*, 902 F.3d 69, 97 (2d Cir. 2018).

Here, the Indictment does not allege that SFM tokens were a "security listed on a U.S. exchange." Accordingly, the *Morrison* question is whether the tokens were "securit[ies] purchased or sold in the United States."[11] Post-*Morrison*, the Second Circuit has held that "to sufficiently allege the existence of a 'domestic transaction in other securities,' plaintiffs must allege facts indicating that irrevocable liability was incurred or that title was transferred within the United States." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 62 (2d Cir. 2012). Irrevocable liability attaches when parties "becom[e] bound to effectuate the transaction or enter[] into a binding contract to purchase or sell securities." *Miami Grp. v. Vivendi S.A.* (*In re Vivendi, S.A. Sec. Litig.*), 838 F.3d 223, 265 (2d Cir. 2016) (internal quotation marks omitted). In other

---

[11] Karony addresses *infra* the question whether SFM tokens are "securities" as that term is used in § 78j(b).

words, irrevocable liability attaches "when the parties to the transaction are committed to one another," or when "in the classic contractual sense, there was a meeting of the minds of the parties." *Absolute Activist*, 677 F.3d at 68 (quoting *Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 891 (2d Cir. 1972)).

Last month, the Second Circuit considered this body of law in the context of cryptocurrency tokens. *Williams v. Binance*, __ F.4th __, 2024 U.S. App. LEXIS 5616 (2d Cir. Mar. 8, 2024). Plaintiffs were purchasers of crypto-assets on the Binance online platform, an offshore electronic exchange. *Id.* at *4. They brought claims under Section 12(a)(1) of the Securities Act of 1933 against Binance, alleging that the exchange sold the crypto tokens without registering them as securities.[12] The district court dismissed the plaintiffs' claims, finding that they constituted an impermissible extraterritorial application of securities laws under *Morrison*. *Id.* at *3. The Second Circuit reversed that decision—but its reasoning shows that, unlike the facts in *Binance*, Count One does not allege facts that make out a domestic Exchange Act offense.

Critical to *Binance* was this fact: plaintiffs purchased the crypo tokens at issue not on a decentralized exchange but in "secondary-market trading," i.e., the Binance centralized exchange. *Binance*, 2024 U.S. App. LEXIS 5616, *7. Plaintiffs had alleged that the infrastructure for the Binance centralized exchange was "located in the United States." *Id.* at *18. The exchange was where buy and sell orders were "matched" and thus where transactions become irrevocable. *Id.* Specifically, they alleged that the exchange was "hosted on computer servers and data centers provided by Amazon Web Services (AWS), a cloud computing company that is located in the United States." *Id.* They alleged that "a significant portion, if not all, of the AWS servers and [associated data centers and support services] that host Binance are located in California." *Id.* The

---

[12] For purposes of that appeal alone, Binance did not challenge the plaintiffs' characterization of the tokens as "securities." 2024 U.S. App. LEXIS 5616 at *7.

Second Circuit was clear that, if the irrevocable liability analysis is concerned at all with the location of token purchase orders, it is to the extent that fact makes "it more plausible that the trades at issue were matched over Binance's servers located in the United States, as opposed to Binance's servers located elsewhere." *Id.*

Here, the Indictment is lacking this critical allegation on which the *Binance* court rested its decision. Virtually all the alleged token transactions in the Indictment concern the BNB Chain and a decentralized exchange described as a "digital-asset offering service." Indictment, ¶¶ 9, 27. As explained *supra*, that service was PancakeSwap, a foreign entity. Unlike the *Binance* plaintiffs, the Indictment does not allege that "matching" was hosted on computer servers and data centers located in the United States. To the contrary, the Indictment positively alleges that,

> [u]nlike a bank's ledger, a blockchain is *distributed across participants of the digital currency's entire network. No company, **country** or third party is in control of it . . .*

Indictment, ¶ 8 (emphasis added).

Even where the Indictment alleges sales of SFM tokens on a centralized exchange, Crypto Exchange 2, it fails to allege that this exchange—BitMart—is "hosted on computer servers and data centers" in the United States, like the centralized exchange in *Binance*. *Binance*, 2024 U.S. App. LEXIS 5616, *18. Nor does it allege whether and to what extent purchase orders for SFM tokens were located in the United States. In any case, the *Binance* court was clear that, even if the Indictment had made such allegations, they would only be relevant to the irrevocable-liability analysis insofar as they make "it more plausible that the trades at issue were matched over . . . servers located in the United States," which the Indictment does not allege here. *Id.* Nor does the Indictment allege that Karony (or Nagy) resided, worked in, or visited the United States during the period of the Indictment. It does not allege that SafeMoon had offices or employees in the United States or otherwise conducted business domestically.

13

Moreover, the Second Circuit has made clear that to satisfy *Morrison*'s domestic-transactions prong, it is not sufficient for a party to allege *some* domestic transaction; the allegations must also not be "so predominantly foreign as to be impermissibly extraterritorial." *Parkcentral Global Hub Ltd. v. Porsche Automobile Holdings SE*, 763 F.3d 198, 216 (2d Cir. 2014). "[W]hile a domestic transaction or listing is *necessary* to state a claim under § 10(b), a finding that these transactions were domestic would not *suffice* to compel the conclusion that the plaintiffs' invocation of § 10(b) was appropriately domestic." *Id.* The Court explained why the facts in *Parkcentral* were predominantly foreign:

> The complaints concern statements made primarily in Germany with respect to stock in a German company traded only on exchanges in Europe. Were this suit allowed to proceed as pleaded, it would permit the plaintiffs, by virtue of an agreement independent from the reference securities, to hale the European participants in the market for German stocks into U.S. courts and subject them to U.S. securities laws. The potential for regulatory and legal overlap and conflict would have been obvious to any legislator who considered the possibility that the statute would result in such an application. Indeed, the fraudulent acts alleged in the complaint have been the subject of investigation by German regulatory authorities and adjudication in German courts. Although we recognize that the plaintiffs allege that the false statements may have been intended to deceive investors worldwide, we think that the relevant actions in this case are so predominantly German as to compel the conclusion that the complaints fail to invoke § 10(b) in a manner consistent with the presumption against extraterritoriality. *Morrison*, 561 U.S. at 266. The complaints thus fail to state a claim upon which relief may be granted.

*Parkcentral*, 763 F.3d at 217-18.

Just so, here. The Indictment has not alleged any domestic "matching," but even if it had, it has not pleaded facts that would overcome the "predominantly foreign" allegations: Karony and Nagy worked and lived abroad; the decentralized exchanges were foreign; no domestic allegations are made with respect to the one centralized exchange at issue, which is also foreign; the Indictment does not allege offices or employees of SafeMoon in the United States; it does not allege that critical SafeMoon infrastructure was located in the United States.

Just as in *Parkcentral*, the "potential for regulatory and legal overlap and conflict" is

14

manifest. 763 F.3d at 217.  For example, consider the fact that Karony operated out of the United Kingdom.  The UK's Financial Conduct Authority does not currently treat cryptocurrency tokens like SFM as "security tokens." *See* Policy Statement Guidance on Cryptoassets: Feedback and Final Guidance to CP 19/3 (the "FCA Statement").[13] Indeed, should the Indictment survive, the Court will learn that SafeMoon was advised by a Magic Circle law firm that SFM token was not a "security token." This "potential for incompatibility between U.S. and foreign law" is a powerful "form of evidence that a particular application of a statute is extraterritorial." *Parkcentral*, 763 F.3d at 217.

For all these reasons, Count One should be dismissed.

### 3.    SFM tokens are not "securities" under § 78j(b)

To establish a Section 10(b) violation, the government must plead and prove that the Defendants made a material misrepresentation or a material omission or used a fraudulent device, "in connection with the purchase or sale of any security . . ." § 78j(b).  The Indictment does not plead facts showing that SFM tokens are a "security."

For purposes of Section 10(b), "security" means:

[A]ny note, stock, treasury stock, security future, security-based swap, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

---

[13] https://www.fca.org.uk/publication/policy/ps19-22.pdf (FCA Statement).  As explained *infra*, this Court should follow the FCA's factors in excluding SFM-like tokens from the definition of SEC-regulated "securities."

15 U.S.C. § 78c(a)(10).

Notably, unlike in the Securities Act (§ 77b(a)(1)), the Exchange Act explicitly excludes currency from the relevant definition: "Security. . .shall not include currency. . ." § 78c(a)(10).

One pertinent component of the "security" definition is "investment contract." In *SEC v. Howey Co.*, the Supreme Court held that under the Securities Act, an investment contract is "a contract, transaction[,] or scheme whereby a person [1] invests his money [2] in a common enterprise and [3] is led to expect profits solely from the efforts of the promoter or a third party." 328 U.S. 293, 298-99, 66 S. Ct. 1100, 90 L. Ed. 1244 (1946).

### a)    Section 78c(a)(10)'s text explicitly excludes currencies

Unlike in other "securities" cases involving cryptocurrencies, this Court need not even address whether, and in what circumstances, such assets constitute "investment contacts." Here, the text of the Exchange Act—unlike in the Securities Act—explicitly excludes "currency" from the definition of "security." § 78c(a)(10).

When interpreting a statute, courts begin with the text.  They "must give effect to the text's plain meaning." *Jingrong v. Chinese Anti-Cult World Alliance*, *Inc.*, 16 F.4th 47, 57 (2d Cir. 2021). And "[w]here the plain meaning of the text is clear, [the court's] inquiry 'generally end[s] there.'" *Id.* (quoting *United States v. Balde*, 943 F.3d 73, 81 (2d Cir. 2019)).  Indeed, courts must enforce that plain meaning even if the proper interpretation raises policy concerns, in the view of the court. *See Eldred v. Ashcroft*, 537 U.S. 186, 222, 123 S. Ct. 769, 154 L. Ed. 2d 683 (2003) ("The wisdom of Congress' action . . . is not within our province to second guess."); *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1823 (2020) (Kavanaugh, J., dissenting) ("Under the Constitution's separation of powers, our role as judges is to interpret and follow the law as written, regardless of whether we like the result. Our role is not to make or amend the law.").

16

"Currency" means "something (such as coins, treasury notes, and banknotes) that is in circulation as a medium of exchange." *Currency*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/currency#:~:text=%3A%20something%20(such%20as%20coins%2C,as%20a%20medium%20of%20exchange.   Courts have determined that the Bitcoin cryptocurrency token, and similar digital assets, satisfies this definition. *CFTC v. McDonnell*, 287 F. Supp. 3d 213, 217-30 (E.D.N.Y. 2018) (repeatedly characterizing crypto assets generally as "currency"); *United States v. Faiella*, 39 F. Supp. 3d 544, 545 (S.D.N.Y. 2014) ("Bitcoin can be easily purchased in exchange for ordinary currency, acts as a denominator of value, and is used to conduct financial transactions."); *SEC v. Shavers*, 2013 U.S. Dist. LEXIS 110018, 2013 WL 4028182, at *2 (E.D. Tex. Aug. 6, 2013) ("It is clear that Bitcoin can be used as money.  It can be used to purchase goods or services. . . [I]t can also be exchanged for conventional currencies . . . .").

At the motion-to-dismiss stage, the Court must assume the Indictment's allegations are true and give effect to their meaning.  *United States v. Velastegui*, 199 F.3d 590, 592 n.2 (2d Cir. 1999). And, here, the Indictment states or implies, repeatedly, that SFM was a currency:

- The Indictment alleges that the Defendants attempted to evade transaction reporting requirements under 31 U.S.C. § 5313(a) ("Reports on domestic coins and currency transactions"), implying that SFM token is a currency.  Indictment, ¶ 66;

- SFM is likened to a "traditional fiat currency." *Id.*, ¶ 5;

- SFM was marketed as a "'*deflationary*' token," an investment term associated with fiat and cryptocurrency.  *Id.*, ¶ 23 (emphasis added);

- SFM was "minted." *Id.*, ¶ 27;[14]

---

[14] In the nonfigurative sense, the transitive verb "mint" means "to make (coins or money) out of metal." *Mint*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/mint.

- SFM was a "token." *Id.*, ¶27;[15]

- SFM's emphasis on supplying liquidity whereby "holders of that token can trade it without significantly affecting the token market's price" is virtually identical to the concept of foreign exchange market liquidity, measured by a trader's ability to swap currencies without affecting exchange rates. *Id.*, ¶ 11;

- SFM was listed on a centralized crypto*currency* exchange, called the "BitMart Cryptocurrency Exchange." *Id.*, ¶ 57;[16]

Just as significant is what the Indictment does *not* allege about SFM.  Unlike with "traditional securities," the Indictment does not allege that SFM tokens "give the token holder ownership or a creditor interest in any corporate entity." *Binance*, 2024 U.S. App. LEXIS 5616, *7. Moreover, the Indictment does not allege facts that make SFM more like a so-called "security-token," i.e., an asset "not designed to facilitate transactions or serve as a long-term store of value, but rather to raise capital for an enterprise without granting the holder ownership in any corporate entity." *Id.*  To the contrary, the Indictment alleges that SFM was marketed as a "deflationary" asset with liquidity, making it indistinguishable from government-acknowledged cryptocurrencies "[]like Bitcoin and Ethereum." *Id.*  In short, the Indictment fails to allege that SFM tokens had

---

[15] "Token" means "a piece resembling a coin issued as money by some person or body other than a de jure government." *Token* (def. 1.b), Merriam-Webster Online, https://www.merriam-webster.com/dictionary/token.

[16] SafeMoon, SFM users, and the public consistently referred to SFM token as a "cryptocurrency." *E.g.*, SafeMoon, Wikipedia, https://en.wikipedia.org/wiki/SafeMoon (referring to SFM as a "cryptocurrency" over 50 times);

Yahoo! Finance, https://finance.yahoo.com/quote/SFM-USD/?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS88&guce_referrer_sig=AQAAAE6lShXLbKci-YdctSrmC1cZV2xyPJ4KDsL-QqeTj8XZlHwGPJBYBG-GCtPiU1ZBYDKtn_L7daRmCkaPpYKn91MBnFpv6AV3XymHB2QlznmoEu7QEnCtSk10PQ2wGAmmvEGMAHeeSuuzCJvCptq2zTA4tlClhYVG1AUcks9XPdA0 (referring to SFM token as a "cryptocurrency").

"some present tangible use beyond their potential to appreciate." *Id.*

As discussed *infra*, some courts have held that digital assets may sometimes satisfy the definition of "security," in the context of the Securities Act's definition of that term, when they carry the features of "investment contracts." *E.g.*, *SEC v. Ripple Labs*, *Inc.*, 2023 U.S. Dist. LEXIS 120486 (S.D.N.Y. July 13, 2023); *SEC v. Terraform Labs Pte. Ltd.*, 2023 U.S. Dist. LEXIS 132046 (S.D.N.Y. July 31, 2023).  But neither decision addressed the fact that, unlike in the Securities Act definition, the text of the Exchange Act specifically excludes "currency" from the definition. *Compare* § 78c(a)(10) *with* § 77b(a)(1).  It is a longstanding rule of statutory construction that the specific trumps the general.  *Morales v. Trans World Airlines*, *Inc.*, 504 U.S. 274, 384, 112 S. Ct. 2031, 119 L. Ed. 2d 157 (1992) ("It is a commonplace of statutory construction that the specific [provision] governs the general.").  Here, the Exchange Act's exclusion of "currency" from the definition of "security" is far more specific than its inclusion of the general term "investment contracts" within the definition.

The government will respond that where an asset is somehow *both* a "currency" and an "investment contract," the latter term trumps and the asset becomes a "security" under § 78c(a)(10). That is inconsistent with the "elephants-in-mouseholes" canon of construction.  Congress "does not alter the fundamental details of a [statutory] scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468, 121 S. Ct. 903, 149 L. Ed. 2d 1 (2001).  Cryptocurrency markets involve billions or trillions of dollars in assets.  Congress would not signal its intent to bring such an elephantine financial sector within the Exchange Act regime through such mousehole indirection (exempting X through a specific provision while including X through a vaguer one).

Another interpretive principle is that the Court must "give effect, if possible, to every clause and word of a statute." *Williams v. Taylor*, 529 U.S. 362, 404, 120 S. Ct. 1495, 146 L. Ed. 2d 389

(2000) (cleaned up).  To characterize a currency as a "security" because it might *also* constitute an "investment contract" is a failure to give any effect to Congress' specific exclusion of "currency" from the statute.  *Taylor*, 529 U.S. at 404.

Accordingly, even if the Court were to conclude that the SFM token constitutes an "investment contract," the Exchange Act's definition of "security" would remain unsatisfied.  Thus, Count One should be dismissed.  But, as Karony explains in the next section, even if the Court were to hold that the Exchange Act term "investment contract" somehow trumps the term "currency," Count One should still be dismissed.

### b)      SafeMoon/PancakeSwap were not like an orange grove

*Howey* concerned a Florida company that offered units of a citrus grove development.  The SEC brought an action against the concern for its failure to register with the Commission in accordance with the Securities Act.  *Howey Co.*, 328 U.S. at 297.  The question was whether the orange grove units were "investment contracts."  In concluding they were and that they satisfied the above-referenced three-factor test, the Supreme Court emphasized these facts:

> [Defendants] are offering an opportunity to contribute money and to share in the profits of a large citrus fruit enterprise managed and partly owned by respondents. They are offering this opportunity to persons who reside in distant localities and who lack the equipment and experience requisite to the cultivation, harvesting and marketing of the citrus products. Such persons have no desire to occupy the land or to develop it themselves; they are attracted solely by the prospects of a return on their investment. Indeed, individual development of the plots of land that are offered and sold would seldom be economically feasible due to their small size. Such tracts gain utility as citrus groves only when cultivated and developed as component parts of a larger area. *A common enterprise managed by respondents or third parties with adequate personnel and equipment is therefore essential if the investors are to achieve their paramount aim of a return on their investments*. . . The test is whether the scheme involves an investment of money in a common enterprise with profits to come *solely* from the efforts of others.

*Howey Co.*, 328 U.S. at 300 (emphasis added).

In *Ripple Labs*, the district court held that certain sales of a digital asset did not constitute "investment contracts" in connection with Securities Act claims.  2023 U.S. Dist. LEXIS 120486,

20

at *36-39.  The Ripple defendants created the XRP token, a digital asset, and sold it in two

different markets: (1) to "sophisticated individuals and entities pursuant to written contracts"

("Institutional Sales") and (2) to "public buyers on digital asset exchanges" ("Programmatic

Sales").  *Id.* at *26-39.  The court found that the former sales were "investment contracts" under

*Howey* (and thus "securities") but that the latter were not.

Applying the three-factor *Howey* test to the Institutional Sales, the court found that the

institutional buyers (1) invested money in XRP token, (2) which was a common enterprise via

"horizontal commonality" (i.e., where investors' assets are pooled and the fortunes of each

investor are tied to the fortunes of other investors, as well as to the success of the overall

enterprise), because the defendants pooled the proceeds of their Institutional Sales and used those

funds to promote and increase the value of XRP; and (3) the institutional buyers were led to expect

profits solely from the efforts of the defendants.  *Ripple Labs*, 2023 U.S. Dist. LEXIS 120486, at

*26-35.

The third *Howey* prong was critical.  Ripple did not merely sell a token alternative to

Bitcoin cryptocurrency: the company mission promoted to institutional investors was,

> to realize an "Internet of Value" by using technology to facilitate the transfer of value
> across the internet.  *Id.* ¶ 35. Specifically, Ripple "seeks to modernize international
> payments by developing a global payments network for international currency
> transfers." *Id.* For instance, Ripple developed a software product called RippleNet, which
> allows customers to clear and settle cross-border financial transactions on mutually agreed
> upon terms. *Id.* ¶ 41. One feature of RippleNet is known as "on demand liquidity"
> ("ODL"). *Id.* ¶ 45. ODL facilitates cross-border transactions by allowing customers to
> exchange fiat currency (for example, U.S. dollars) for XRP and then the XRP for another
> fiat currency (for example, Mexican pesos).

*Ripple Labs*, 2023 U.S. Dist. LEXIS 120486, at *7.

Ripple's marketing materials stated that the company would continue to sign up banks to

commercially deploy its unique "Internet of Value" protocol and join its "global payments

network." *Id.* at *31.  The "Internet of Value" Ripple touted would require and would receive

continued investment from the company. *Id.* at *32. In addition, in the Institutional Sales contracts, some "Institutional Buyers agreed to lockup provisions or resale restrictions based on XRP's trading volume." *Id.* at *34. The court found that these restrictions were "inconsistent with the notion that XRP was used as a currency or for some other consumptive use." *Id.* Indeed, some Institutional Sales contracts required the Institutional Buyer to indemnify Ripple for claims arising out of the sale or distribution of XRP—provisions "support[ing] the conclusion that the parties did not view the XRP sale as a sale of a commodity or a currency. . ." *Id.*

In contrast were the Programmatic Sales. Here, Ripple sold XRP token to public buyers on digital asset exchanges and understood that people were speculating on XRP as an investment, "explicitly target[ing] speculators[s,] and ma[king] increased speculative volume a 'target goal.'" *Ripple Labs*, 2023 U.S. Dist. LEXIS 120486, at *35. Thus, here the third *Howey* factor cut against an "investment contract":

> Ripple's Programmatic Sales were blind bid/ask transactions, and Programmatic Buyers could not have known if their payments of money went to Ripple, or any other seller of XRP. . . Further, it is not enough for the SEC to argue that Ripple "explicitly targeted speculators" or that "Ripple understood that people were speculating on XRP as an investment," SEC Mem. at 28, because a speculative motive "on the part of the purchaser or seller does not evidence the existence of an 'investment contract' within the meaning of the [Securities Act]," *Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 253 F. Supp. 359, 367 (S.D.N.Y. 1966). "[A]nyone who buys or sells[, for example,] a horse or an automobile hopes to realize a profitable 'investment.' But the expected return is not contingent upon the continuing efforts of another." *Id. [*37]* (citing *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 348, 64 S. Ct. 120, 88 L. Ed. 88 (1943)). The relevant inquiry is whether this speculative motive "derived from the entrepreneurial or managerial efforts of others." *Forman*, 421 U.S. at 852. It may certainly be the case that many Programmatic Buyers purchased XRP with an expectation of profit, but they did not derive that expectation from Ripple's efforts (as opposed to other factors, such as general cryptocurrency market trends)—*particularly because none of the Programmatic Buyers were aware that they were buying XRP from Ripple*.

*Ripple Labs*, 2023 U.S. Dist. LEXIS 120486, at *36 (emphasis added).

Moreover, "the Programmatic Sales were not made pursuant to contracts that contained lockup provisions, resale restrictions, indemnification clauses, or statements of purpose." *Id.* at

22

*38.

Here, the Indictment's allegations are far closer to Ripple's Programmatic Sales than to the Institutional Sales.  First, it is alleged that after its minting, SFM token was made "available for sale" on "a digital-asset offering service." Indictment, ¶27.  As indicated *supra*, that service refers to PancakeSwap, a decentralized exchange (a "DEX").  *SEC v. Braden J. Karony*, *et al.*, 23-cv-8138-RML, pp. 10-12.  PancakeSwap exchange facilitates peer-to-peer transactions, which do not require authorization from any entity: thus, users can remain anonymous.  PancakeSwap, Terms of Service, https://pancakeswap.finance/terms-of-service.  Therefore, just like with *Ripple Labs*' Programmatic Sales, acquirers of SFM token on the DEX "could not have known if their payments of money went to" SafeMoon or to some other entity or individual.  *Ripple Labs*, 2023 U.S. Dist. LEXIS 120486, at *36.

Second, the Indictment alleges that SFM token was later made available on Crypto Exchange 2, the centralized exchange called BitMart.  Indictment, ¶57.  But it does not allege that payments for SFM token on this exchange in fact went to SafeMoon, as opposed to BitMart or to other traders.  *Id.*

Third, just like with *Ripple Labs*' Programmatic Sales, the Indictment does not allege that SFM tokens were sold "pursuant to contracts that contained lockup provisions, resale restrictions, indemnification clauses, or statements of purpose." *Ripple Labs*, 2023 U.S. Dist. LEXIS 120486, at *38.

Fourth, so far from alleging that SFM holders expected profits from "the entrepreneurial or managerial efforts of" the Defendants, the Indictment explicitly alleges profits expected from *an automated process*: PancakeSwap, where SFM was made available for sale, is an Automated Market Maker.  PancakeSwap, Exchange, https://docs.pancakeswap.finance/products/pancakeswap-exchange.  The liquidity pool Nagy

23

established would function *automatically*.  Indictment, ¶ 12 ("Token swaps completed via liquidity pool are typically managed by a type of smart contract code known as an *automated market maker* and *not by human operation*.") (emphasis added); s*ee also* PancakeSwap, Exchange, https://docs.pancakeswap.finance/products/pancakeswap-exchange (explaining that liquidity pool operation is automated); *SEC v. Braden J. Karony*, *et al.*, 23-cv-8138-RML, p. 9 ("Nagy's purported vision for SafeMoon, as stated in his marketing materials, was to create a . . . '*self-regenerating automatic liquidity providing protocol. . .*'") (emphasis added).

The Indictment specifically alleges that Karony informed the public that the liquidity pool was "automated":



Indictment, ¶ 51.

What the Indictment alleges, then, is precisely the opposite of the third prong of *Howey*'s investment contracts test.  In *Howey*, the expected profits could not be generated without "the cultivation, harvesting and marketing of the citrus" groves.  *Howey Co.*, 328 U.S. at 300. The *Howey* investors could not be expected to travel from "distant localities," without "the equipment and experience requisite to [] cultivation," to harvest the oranges themselves.  *Id.* Thus, profits were derived "*solely* from the efforts of" the company defendant and the sales were, for that reason, "investment contracts." *Id.* (emphasis added).

Here, the Indictment does not allege that "profits" (allegedly) arising from SFM's liquidity

pool function were derived *at all* from the human efforts of the Defendants, much less "solely" from such unalleged efforts.  To see appreciation in the price of SFM, holders did not need to travel anywhere or do anything.  No human needed to: the liquidity pool functioned through "an automated market maker and not by human operation." Indictment, ¶ 12.

Accordingly, even if a "security" can both be a "currency" and an "investment contract," the Indictment has failed to allege an "investment contract" under *Howey*.  Count One should therefore be dismissed.

### 4.    Fair warning and lenity

Because Karony challenges the scope of a federal criminal statute and its application to his alleged conduct, additional interpretive rules apply.  That is because courts have "traditionally exercised restraint in assessing the reach of a federal criminal statute." *United States v. Aguilar*, 515 U.S. 593, 600, 115 S. Ct. 2357, 132 L. Ed. 2d 520 (1995).  The Supreme Court has urged this restraint "both out of deference to the prerogatives of Congress and out of concern that 'a fair warning should be given the world in language that the common world will understand, of what the law intends to do if a certain line is passed.'" *Id.* at 600 (citations omitted).  This "prudent rule of construction" continues with force today." *Dowling v. United States*, 473 U.S. 207, 214, 105 S. Ct. 3127, 87 L. Ed. 2d 152 (1985); *see Marinello v. United States*, 138 S. Ct. 1101, 1108, 200 L. Ed. 2d 356 (2018) (endorsing the rule).

There are three "manifestations" of the fair warning requirement:

First, the vagueness doctrine bars enforcement of "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally* v. *General Constr. Co.,* 269 U.S. 385, 391, 70 L. Ed. 322, 46 S. Ct. 126 (1926); accord *Kolender* v. *Lawson,* 461 U.S. 352, 357, 75 L. Ed. 2d 903, 103 S. Ct. 1855 (1983); *Lanzetta* v. *New Jersey,* 306 U.S. 451, 453, 83 L. Ed. 888, 59 S. Ct. 618 (1939). . .

Second, as a sort of "junior version of the vagueness doctrine," H. Packer, The Limits of the Criminal Sanction 95 (1968), the canon of strict construction of criminal statutes, or rule of

25

lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered. See, *e.g., Liparota* v. *United States,* 471 U.S. 419, 427, 85 L. Ed. 2d 434, 105 S. Ct. 2084 (1985); *United States* v. *Bass,* 404 U.S. 336, 347-348, 30 L. Ed. 2d 488, 92 S. Ct. 515 (1971); *McBoyle, supra,* at 27. . .

Third, although clarity at the requisite level may be supplied by judicial gloss on an otherwise uncertain statute, see, *e.g., Bouie, supra,* 378 U.S. at 357-359; *Kolender, supra,* 461 U.S. at 355-356; *Lanzetta, supra,* 306 U.S. at 455-457; J. Jeffries, Legality, Vagueness, and the Construction of Penal Statutes, 71 Va. L. Rev. 189, 207 (1985), due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope, see, *e.g., Marks* v. *United States,* 430 U.S. 188, 191-192, 51 L. Ed. 2d 260, 97 S. Ct. 990 (1977); *Rabe* v. *Washington,* 405 U.S. 313, 31 L. Ed. 2d 258, 92 S. Ct. 993 (1972); *Bouie, supra,* 378 U.S. at 353-354; cf. U.S. Const. Art. I, § 9, cl. 3; id. § 10, cl. 1; *Bouie, supra,* 378 U.S. at 353-354 (*Ex Post Facto Clauses* bar legislatures from making substantive criminal offenses retroactive).

*United States v. Lanier*, 520 U.S. 259, 266, 117 S. Ct. 1219, 137 L. Ed. 2d 432 (1997).

While courts occasionally apply the rule of lenity only upon a finding of "grievous" ambiguity, it's far from clear that ambiguity must meet some sort of threshold standard of grievousness before the rule of lenity applies. *See Wooden v. United States*, 142 S. Ct. 1063 (2022) (Gorsuch and Sotomayor, J.J., concurring) (tracing the history of using "grievous" when describing an ambiguity). The better rule is that "lenity applies whenever, after all legitimate tools of interpretation have been exhausted, a reasonable doubt persists regarding whether Congress has made the defendant's conduct a federal crime." *Abramski v. United States*, 573 U.S. 169, 204 (2014) (Scalia, J., dissenting); *see also Yates v. United States*, 574 U.S. 528, 547 (2015) (applying rule of lenity based on a finding of statutory "ambiguity," simpliciter).

Here, even if this Court holds that the SFM cryptocurrency was an "investment contract" and thus a "security," notwithstanding the Exchange Act's explicit exclusion of "currency" from that definition, it should still acknowledge that such an interpretation is not entirely without ambiguity. Had § 78c(a)(10) failed to mention "currency" altogether, Karony could still have persuasively contended that currency like SFM token cannot satisfy the definition of "security"

under the principle of *expressio unius est exclusio alterius.* But here, where § 78c(a)(10) explicitly exempts "currency" from the definition, a construction that nevertheless deems a currency a "security" because it is also an "investment contract," can be no better than an ambiguous one, and arguably a grievously ambiguous one.

In 2021, Karony was the CEO of a cryptocurrency company. Everyone called SFM a cryptocurrency. Had he looked up the text of the Exchange Act himself, he would have seen that the term "security" explicitly excluded "currency" and that the federal securities laws only apply to "securities." Of course, this is not "fair warning . . . in language that the common world will understand" that cryptocurrencies are "securities" under the Exchange Act, and the very fact that cryptocurrencies have spawned confusion in the federal agencies and courts themselves over the appropriate regulatory regime shows there is no reasonable argument otherwise. *E.g.*, *McDonnell*, 287 F. Supp. 3d 213, 217-30 (highlighting uncertainty over which agency or agencies may regulate cryptocurrency).

The same fair warning principles apply to the question of extraterritoriality. Even if the Court concludes that Count One's securities fraud conspiracy is not "predominantly foreign," *Parkcentral*, 763 F.3d at 216, such a determination is not without ambiguity. As explained, the Indictment does not allege that Karony resided or worked in the United States during the period of the alleged conspiracy; the DEX were foreign; no domestic allegations are made with respect to the one centralized exchange at issue, which is also foreign; the Indictment does not allege offices or employees of SafeMoon in the United States; it does not allege that critical SafeMoon infrastructure was located in the United States. Here too, then, there was no "fair warning . . . in language that the common world will understand" that the U.S. securities laws would apply to

27

Karony's operations in the UK.[17]

Accordingly, Count One should be dismissed for these reasons.

### C.    Count Two, charging wire fraud conspiracy, should be dismissed

#### 1.    Elements of wire fraud conspiracy

"The essential elements of [mail and wire fraud] are (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme." *United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015). To prove the existence of a scheme to defraud, the government must also prove "that the misrepresentations were material." *U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 657 (2d Cir. 2016) and that the defendant acted with fraudulent intent. *United States v. Greenberg*, 835 F.3d 295, 305 (2d Cir. 2016). A statement is material if the "misinformation or omission would naturally tend to lead or is capable of leading a reasonable [person] to change [his] conduct." *United States v. Rybicki*, 354 F.3d 124, 145 (2d Cir. 2003) (en banc). Any person who conspires to commit wire fraud shall be subjected to the same penalties as those prescribed for the offense, the commission of which was the object of the conspiracy. 18 U.S.C. § 1349.

#### 2.    Count Two is impermissibly extraterritorial

The wire fraud statute, § 1343, does not apply extraterritorially. *United States v. Napout*, 963 F.3d 163, 178 (2d Cir. 2020). Thus, the *Morrison* inquiry turns to the question "'whether the case involves a domestic application of the statute.'" *Id.* (quoting *RJR Nabisco*, 136 S. Ct. at 2101). This question is answered by locating § 1343's focus, i.e., "'the object of its solicitude, which can include the conduct it seeks to regulate, as well as the parties and interests it seeks to protect or

---

[17] The fact that Karony and SafeMoon sought out a legal opinion from a British law firm about whether SFM token could be deemed a security under the authority of the FCA, not SEC, is powerful confirmation of a lack of fair warning.

28

vindicate.'" *Id.* (quoting *WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129, 2137, 201 L. Ed. 2d 584 (2018)). "If the conduct [at issue] relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application of the statute, even if other conduct occurred abroad. But if the relevant conduct occurred in another country, then the case involves an impermissible extraterritorial applicable regardless of any other conduct that occurred in U.S. territory." *WesternGeco LLC*, 138 S. Ct. at 2137.

"The focus of § 1343 is 'the use of the . . . wires in furtherance of a scheme to defraud.'" *Napout*, 963 F.3d at 180 (quoting *Bascuñán v. Elsaca*, 927 F.3d 108, 122 (2d Cir. 2019)). Thus, the question is whether  (1) the defendant used domestic mail or wires in furtherance of a scheme to defraud, and (2) the use of the mail or wires was a core component of the scheme to defraud." *Bascuñán*, 927 F.3d at 122.[18]

It is instructive to compare the wire fraud allegations in *Bascuñán* with those in the Indictment.  Plaintiffs' wire fraud claim (a civil RICO predicate) was called the "New York Trust Account Scheme." *Bascuñán*, 927 F.3d at 121. The defendant, a citizen and resident of Chile, perpetrated a fraudulent scheme by creating a bogus trust called the Capri Star Trust and funding its New York bank account with money from a foreign trust, and using domestic mail and wires to order UBS bank—located in New York—to transfer millions of dollars from that U.S. account to himself. "[R]epeated use of domestic mail and wires to fraudulently order a domestic bank to transfer millions of dollars out of a domestic account was a core component of the alleged scheme to defraud." *Id.* at 123.

Here, by contrast, the Indictment does not allege that domestic wires were a "core component" of the alleged scheme to defraud for a simple reason: it does not allege a single

---

[18] As discussed, the extraterritorial reach of a conspiracy statute is coterminous with the underlying criminal statute.  *Hoskins*, 902 F.3d at 96.

instance of domestic acquisition of SFM token, or of some other specific use of domestic wires in furtherance of the wire fraud scheme. It does not allege that domestic wires were used to list SFM token on the PancakeSwap or BitMart exchanges, neither of which is alleged to be a domestic business.

The Indictment generally alleges that SafeMoon marketed SFM token on "websites," but beyond the boilerplate allegation that these websites were viewable by "prospective SFM investors in the Eastern District of New York" (like all other people in the world with an internet connection) it does not allege why this constituted a use of "domestic" wires that was a "core component of the scheme." Indictment, ¶ 29. If a universal allegation that false claims were made on the internet (by definition viewable by anyone with a computer and a connection) were sufficient to render every fraud in the world a domestic one, the presumption against extraterritoriality would turn into a "craven watchdog" indeed. *Morrison*, 561 U.S. at 266. The same goes for Karony's alleged statements on Twitter/X and online Ask Me Anything sessions (which Karony conducted from the UK). Indictment, ¶¶ 38, 51-52. The Indictment alleges that Karony and Smith transferred SFM tokens and stablecoins into their personal wallets and alleges transfers of fiat currency into bank accounts—but doesn't allege domestic wires were used and doesn't allege the bank accounts were domestic, unlike in *Bascuñán. Id.*, ¶ 59.

As explained *supra*, even if the Indictment alleges some domestic component to a charge, it may still be "so predominantly foreign as to be impermissibly extraterritorial." *Parkcentral*, 763 F.3d at 216. Just so here: there is no allegation the Defendants resided or worked in the United States during the period of the alleged conspiracy; the DEX were foreign; no domestic allegations are made with respect to the one centralized exchange at issue, which is also foreign; the Indictment does not allege offices or employees of SafeMoon in the United States; and it does not allege that critical SafeMoon infrastructure was located in the United States.

30

Accordingly, Count Two should be dismissed.

**D.      Count Three, charging money laundering conspiracy, should be dismissed**

**1.      Elements of money laundering conspiracy**

A defendant commits money laundering when, "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

(A)

(i) with the intent to promote the carrying on of specified unlawful activity; or

. . .

(B) knowing that the transaction is designed in whole or in part—

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

(ii) to avoid a transaction reporting requirement under State or Federal law . . .

18 U.S.C. § 1956(a).

Conspiracy to commit money laundering is a separate offense.  18 U.S.C. § 1956(h).

Here, the Indictment alleges two specified unlawful activities (SUA): the crimes charged in Counts One and Two.  Indictment, ¶ 66.  It alleges that the Defendants conducted financial transactions involving these SUA to avoid reporting requirements under 31 U.S.C. § 5313(a) ("Reports on domestic coins and currency transactions").  *Id.*

**2.      Count Three fails to properly allege SUA**

As indicated, Count Three alleges only two SUA at issue: the crimes charged in Counts One and Two.  Because those Counts should be dismissed and because the Indictment alleges no other SUA, Count Three should be dismissed.  § 1956(a).

31

**Conclusion**

For all the foregoing reasons, the Court should dismiss Counts One through Three of the

Indictment.

Dated: April 9, 2024                    Respectfully submitted,

_/s/ Nicholas D. Smith_
Nicholas D. Smith
1123 Broadway, Suite 909
New York, NY 10010
Phone: (917) 902-3869
nds@davidbsmithpllc.com

**Certificate of Service**

I hereby certify that on the 9th day of April, 2024, I filed the foregoing motion with the

Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the

following CM/ECF user(s):counsel of record.

And I hereby certify that I have mailed the document by United States mail, first class

postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

_/s/ Nicholas D. Smith_
Nicholas D. Smith
1123 Broadway, Suite 909
New York, NY 10010
Phone: (917) 902-3869
nds@davidbsmithpllc.com