UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x

 UNITED STATES OF AMERICA,

          -against-                              **MEMORANDUM & ORDER**
                                                      23-CR-433
 BRADEN J. KARONY,

                    Defendant.

------------------------------------x
ERIC KOMITEE, United States District Judge:

          Defendant Braden Karony was convicted, following a

jury trial, of having participated in three criminal

conspiracies.  Jury Verdict, ECF No. 198.  He moves for a

judgment of acquittal under Federal Rule of Criminal Procedure

29.  For the reasons set forth below, the motion is denied.

## I.   Background

          Karony was indicted on charges of conspiracy to commit

securities fraud (Count One), conspiracy to commit wire fraud

(Count Two), and conspiracy to commit money laundering (Count

Three).  The following facts are taken from the evidence adduced

at trial, with all inferences drawn in the government's favor.

*United States v. Walker*, 191 F.3d 326, 333 (2d Cir. 1999).  We

set out only the facts necessary to decide the motion.

           Karony was CEO of SafeMoon LLC, a company that

created a new cryptocurrency (the SafeMoon token, or "SFM").

Trial Tr. 203:15-17, 208:1-3 (testimony of Thomas Smith, former

SafeMoon CTO).  Kyle Nagy, a co-conspirator, developed the initial technology for the SFM token, and launched it in early March 2021.  Tr. 208:9-16 (Smith).  In the middle of March, Karony joined as CEO, and Thomas Smith, another co-conspirator, became the chief technology officer.  Tr. 203:15-22, 224:7-13, 318:9-23, 362:7-11 (Smith).

At trial, Smith testified that SFM's main selling points were outlined in a "white paper" — a marketing document SafeMoon published on its website in March 2021, just days before Karony's arrival.  GX-8000 (website homepage); GX-8002, at 6-7 (white paper); Tr. 322-23, 336:7-16 (Smith).  The white paper presented SFM as designed to prevent an initial "valuation bubble" and appreciate gradually as more investors purchased it. GX-8002, at 2, 3; Tr. 972:7-19 (SafeMoon investor Bukowski); *id.* at 49:19-50:5 (investor Maurer).[1]  It set out two key features, among others, to distinguish the SafeMoon token from other crypto assets.

The first was the "SafeMoon protocol" — essentially, the features affecting the token's issuance and trading.  Some witnesses referred to these features as SFM's "tokenomics."  GX-8002, at 2, 6; Tr. 47:2-9 (Maurer); *id.* at 878:16-21 (investor

---

[1] The company was named "SafeMoon" because it intended to offer a "safe" way to the "moon," a metaphor for a gradual increase to a high SFM value.  *See* Tr. 319-20, 437 (Smith); GX-1041-3, at 2 (Karony explaining, in a chat on the messaging service Discord, that his username was CPT_HODL_T_MUN#8088 to encourage users to retain their token holdings).

George).  Prominent among these was that each SFM transaction
was subject to a 10% tax.  GX-8002, at 6.  Half of this tax, the
"reflections" portion, would be redistributed to SFM holders,
increasing their holdings.  *Id.*; Tr. 307:4-9 (Smith).  The other
half would be placed into a liquidity pool (the "LP") — a
reserve of tokens established to ensure that investors had
access to liquidity when they wished to exit their SafeMoon
positions.  GX-8002, at 6-7; Tr. 307:16-08:9 (Smith).  The white
paper referred to the "automatic" addition of liquidity to the
LP as the token's "secret sauce."  GX-8002, at 5.  Smith
testified that this was intended to suggest that the LP portion
of the tax would be deposited into the LP without manual
intervention.  Tr. 674:16-18 (Smith); *see id.* at 48:11-21
(Maurer); *id.* at 880:23-81:7 (George).

        Second, the white paper laid out a four-step plan to
ensure that SFM retained its value.  GX-8002, at 7 (outlining
"Step by Step Plan to Ensure 100% Safety").  Both the SafeMoon
developers and investors placed particular emphasis on steps
three and four.[2]  *See* GX-8002, at 7; Tr. 339:8-40:24 (Smith); *id.*
at 276, 281 (investor Olshansky).  Step three spoke of a lock on

_____

[2] Step one provided, "Dev Burned All Tokens in Dev Wallet Prior to
Launch."  Step two provided, "Fair Launch on DxSale."  As Smith explained, a
"dev burn" occurs when the developer makes unusable a certain number of
tokens, thereby creating a limited universe of tradeable tokens.  Tr. 337
(Smith); Tr. 293:13-16 (Olshansky).  A fair launch sale is where potential
investors all have the same initial opportunity to buy the asset.  Tr.
338:15-22 (Smith).

the liquidity pool: it provided, "LP Locked on DxLocker for 4 years," referring to a third-party application that provided for liquidity-pool custody.  Tr. 339, 395:17-21 (Smith).  Similarly, step four provided, "LP Generated With Every Trade *and Locked on Pancake* [a trading venue, discussed below]."  *See* GX-8002, at 7 (emphasis added).  Smith testified that "locked" meant that the SafeMoon developers could not withdraw from it.  Tr. 328:21-29:1-9, 339:8-18 (Smith); *see* Tr. 50:23-25 (Maurer).

SafeMoon was listed for trading in two primary venues.  Tr. 240:18-22, 463, 755 (Smith).  One was "PancakeSwap."  Tr. 240:18-22.  SafeMoon hosted the LP on PancakeSwap.  Tr. 309:5-10 (Smith).  Special Agent Jeffrey Petrower, the government's asset-tracing witness, explained that a "smart contract," or unique software code, dictated the liquidity pool's functioning.  Tr. 1799:17-1800:8.  The smart contract implemented a feature called "swap and liquify," which converted the LP portion of the tax into a pair of coins — a SafeMoon coin and a Binance ("BNB") coin, another digital token.  GX-6000 (chart outlining tokenomics); Tr. 1794:11-14, 1832 (Petrower).  When this pair was added to the LP, an "LP token," or a receipt for the deposit, was sent to a secure address associated with the smart contract's owner, which functioned as a digital wallet.  GX-6000; GX-6002 (listing wallet addresses that served as the SFM contract owner); Tr: 229-30 (Smith); *id.* at 1794:11-

14 (Petrower).  LP token pairs could only be withdrawn through the use of LP tokens.  Tr. 1796:15-18 (Petrower).

As both Smith and SafeMoon investors testified, maintaining a robust balance of these token pairs in the liquidity pool provided some assurance that SFM holders would be able to sell SFM tokens when they wished and receive BNB in exchange.  Tr. 239:9-14 (Smith); *id.* at 276:6-15 (Olshansky); 1252:14-20 (investor Sutton).  When SFM trading increased, the token tax and locked LP would preserve an adequate supply of liquidity.  Tr. 243:7-45:7 (Smith).  Professor John Griffin, the government's cryptocurrency expert, testified that a locked LP also provided assurances against a "rug pull," which is essentially theft: Griffin testified that a rug pull occurs when investors "put money in the pool" and "the founders of a project that control or wrote the [smart] contract" "basically take all the funds" and "pull the rug on everybody else."  Tr. 139:13-24; *see id.* at 884:13-20 (George).

In addition to PancakeSwap, SFM traded on a second exchange called BitMart.  Tr. 41:16-18 (Maurer).  When SFM began trading on BitMart, SafeMoon announced that BitMart would replicate SFM's tokenomics.  GX-3003-A (Karony announcement to SafeMoon investors that BitMart would use SafeMoon tokenomics); GX-8017 (BitMart press release announcing SFM).  Because BitMart lacked the functionality to host a liquidity pool, however,

SafeMoon designed a mechanism to manually implement SFM tokenomics for such trading.  Tr. 459:10-15 (Smith); GX-6001 (chart outlining tokenomics on BitMart).  SafeMoon developers received the LP portion of the tax associated with BitMart trades each month, and then manually deposited the commensurate token pairs into the LP on PancakeSwap.  Tr. 459:10-15 (Smith).

The SafeMoon team publicized SFM on several online platforms.  In particular, the developers discussed SFM in a series of live-stream YouTube videos known as "Ask Me Anythings," or "AMAs."  *E.g.*, GXs-3000-3006; Tr. 401:2-11, 449:13-50:1 (Smith).  SafeMoon hosted the AMAs to expand SafeMoon's reach and discuss its tokenomics with current and potential investors.  Tr. 401:2-11, 449:13-50:1 (Smith); *id.* at 885 (George).  In an April 1, 2021 AMA, Smith reiterated that half of the SFM tax "goes to PancakeSwap and it's locked." GX-3003-A; *see also* GX-3002-A (March 25, 2021 AMA).  In another AMA (about one week later), Karony explained that for trades on BitMart, the tax would be "added back to the liquidity pool." GX-3004-B.  Several investors testified that after watching the AMAs, they felt assured that no "rug pull" would occur because the LP was locked.  *E.g.*, Tr. 1340 (investor Uhric); Tr. 885 (George).

The government's evidence contradicted these (and other) statements about SFM.  Smith testified that from SFM's

creation, Nagy — and upon joining, Smith and Karony — could access the LP at will.  Tr. 340:3-14, 565:19-24, 657:16-24 (Smith).  Because they retained unrestricted access to the SafeMoon contract owner wallets designated to receive the LP tokens, Tr. 501:23-02:8, 504:9-10, 512:23-25 (Smith); *id.* at 1796-99, 1831:15-24 (Petrower), the LP was not "locked" in any physical sense.  On the contrary, the developers could withdraw assets from it as they saw fit.  Tr. 436-37, 662:10-16 (Smith).

And they did so frequently.  Between April 2021 and September 2021 — the same period when the white paper stated that the LP was locked — Smith made eighteen withdrawals from the LP.  Tr. 1810:10-18, 1832:23-33:4-15 (Petrower); GX-6006, at 11 (government asset tracing exhibit).  Each time, he did so at Karony's request.  Tr. 485, 504-05 (Smith).  Many of these withdrawals were for sums exceeding $1 million, including one for $6.3 million on July 8.  GX-6006, at 11.  Further, the government showed that when BitMart sent SafeMoon the 10% tax payments, Karony diverted at least some of these assets for personal benefit rather than depositing them into the LP. Tr. 2016 (Petrower); Tr. 475:3-6, 482-83 (Smith).

The developers did communicate that they might use the LP for certain limited purposes associated with managing the endeavor.  On April 20, 2021, a Twitter user known as "#WARONRUGS" ("War on Rugs") — an account that sought to reveal

crypto fraud — accused the SafeMoon developers of accessing the LP. GX-7002-A, at 2; Tr. 546:13-22 (Smith). Karony tweeted in response that this was "fake news," GX-7001-L-1, but went on to state that "situations arise which may require" use of the LP for business purposes including SafeMoon's "development costs" — but only as a "last resort." Tr. 352 (Smith); GX. 7001-L-5, -L-6 (Karony tweets).

Contrary to those assurances, Karony and his co-conspirators moved assets from the LP through a series of personal crypto wallets to private bank accounts and spent the proceeds on luxury automobiles and real estate, among other things. Tr. 505:9-13 (Smith); GX-6006, at 50-53. SafeMoon made periodic announcements that it was locking the LP. *See* GX-3002-A (March 25, 2021 AMA announcing that the LP was locked); Tr. 329, 646:15-20 (Smith); *id.* at 2372 (Professor Mizrach). Often, however, Karony and his co-conspirators unlocked the LP and withdrew from it for personal benefit within just days after such announcements — without informing investors they were doing so. *E.g.*, GX-1042-9 (Karony's April 1 request to Smith to withdraw from the LP); GX-1042-12 (April 8 request); Tr. 534-35 (Smith).

\*      \*      \*

At the close of the government's evidence, Karony moved orally for a judgment of acquittal. Tr. 2462:16-18; Fed.

R. Crim. P. 29(a).  He did not provide a specific basis for his motion, and the Court reserved judgment.  *See* Tr. 2462:19-20.

        After the jury convicted Karony on all counts, he renewed his motion for acquittal in a three-sentence letter.  Like the oral motion, this letter provided no basis beyond the general statement that "the government presented insufficient evidence to convict."  Renewed Rule 29 Mot. 1, ECF No. 204; Fed. R. Crim. P. 29(c).  The Court set a briefing schedule, inviting Karony to file a brief in support of the motion.  *See* Docket Order dated June 4, 2025.  Karony did not file that brief.  Nevertheless, the government responded comprehensively.  Government Opp'n to Rule 29 Mot., ECF No. 214.  Karony then filed a reply.  *See* Karony Reply in Supp. of Rule 29 Mot., ECF No. 218.  He challenges the sufficiency of the evidence generally, and makes a series of specific arguments, as discussed below.[3]

## II.  Discussion

        Rule 29 motions face a high bar: a defendant can prevail "only if the evidence that the defendant committed the

---

[3] Although Karony timely made his Rule 29 motion, *see United States v. Allen*, 127 F.3d 260, 264 (2d Cir. 1997), he did not offer arguments in support.  His election put the government at a disadvantage in preparing its opposition, and meant that Karony raised *all* his Rule 29 arguments in reply. An argument raised for the first time in a reply brief is typically waived. *United States v. George*, 779 F.3d 113, 119 (2d Cir. 2015) (raising for the first time an argument in a reply is "reason enough to reject" it); *see also United States v. Hatfield*, 795 F. Supp. 2d 219, 242 (E.D.N.Y. 2011) (refusing to reach merits of argument raised for the first time in reply brief). Several of his arguments are rejected on this basis, and on the merits.

crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999).[4]  We review the sufficiency of the evidence "in the light most favorable to the government, and all permissible inferences must be drawn in the government's favor." *United States v. Landesman,* 17 F.4th 298, 319 (2d Cir. 2021).

For conspiracy convictions — like those on all counts here — "the deference accorded a jury's verdict is especially important because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *United States v. Hild*, 147 F.4th 103, 110-11 (2d Cir. 2025).

Karony's motion for a judgment of acquittal is denied, largely for the reasons explained in the government's briefs. *See* ECF Nos. 214, 230.  The evidence presented was not so "nonexistent or . . . meager that no reasonable jury" could have found the defendant guilty.  *Guadagna*, 183 F.3d at 130.  To the contrary, it was overwhelming.  We take up four of Karony's specific arguments below.

---

[4] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

A.    **Sufficiency of Evidence as to Counts I (Securities Fraud
      Conspiracy) and II (Wire Fraud Conspiracy)**

*False Statements.* Karony argues that the evidence
failed to establish any misrepresentations to SFM purchasers.
Reply 1-5.  He also argues that because SafeMoon announced in
their AMAs that the developers were going to lock the LP, they
implicitly disclosed that the LP was not locked *prior* to those
announcements.  Reply 4-5*.*  But the evidence was easily
sufficient for a reasonable jury to conclude that Karony and his
co-conspirators made materially false statements.

First, Karony argues that the evidence was
insufficient to show that the statements from the SafeMoon
website and white paper concerning the LP were false.  Reply 1-
3.  The website stated, among other things, that "[e]very trade
contributes toward automatically generating liquidity toward
Pancake Swap — locked forever."  GX-8000, at 1; Reply 1-2.  And
the white paper contained the statement that "LP Generated With
Every Trade & Locked on Pancake."  GX-8002, at 7; *see also* GX-
8004, at 3; GX-8009, at 3 (later versions of the white paper).

Karony argues that the website's statement about
automatic locking was qualified by his and his colleagues'
statements during the AMAs, in which they spoke of locking the
LP on several occasions in March and April 2021.  These
comments, he contends, at least implied that the LP was not

"automatically" locked.  As to the white paper, he argues that
the phrase "and Locked on Pancake" should naturally have been
understood to mean that "some unspecified amount [was] locked" —
not the entire LP.  Reply 3.  He goes on to argue that this
statement was literally true because some portion of the LP was
"periodically locked beginning within days of [his] arrival at
the company."  *Id.*

        The evidence, however, was more than sufficient to
conclude that these statements were false.  As Smith testified,
removing from the LP had the "opposite effect of locking"
because it could lead to a "rug pull" – precisely what a locked
LP was meant to avoid.  Tr. 532:15-22.[5]  Regardless, Karony never
disclosed that the LP would be unlocked to finance his (and his
co-conspirators') purchases of luxury automobiles and real
estate.  Tr. 441:22-42:9 (Smith).  To the contrary, they took
measures to conceal their access.  Tr. 436-37:5 (Smith).  Smith
testified that when he posted photos of himself with luxury
cars, he "l[ied] about the source of the funds" because if
investors "knew" he and Karony were using LP funds for such
ends, they would sell their SFM.  Tr. 442:16-43:3 (Smith).  The
government also introduced a Discord chat where Smith and Karony

---

[5] SafeMoon investors understood a "locked" LP to mean that the
developers could not access the LP at all.  Tr. 1347:17-19 (Uhric); *id.* at
51:10-15 (Maurer); *id.* at 273:17-21 (Olshansky).  This understanding was
reasonable, in light of all the evidence: a "locked" LP that could be opened
would defeat the entire purpose of locking.  Tr. 1035:20-36:1-7 (Wyatt).

discussed withdrawing from the LP in increments in order to avoid driving the LP to "dangerously low" levels. Tr. 430; GX-1042-8, at 2, 6. And in an AMA from March 19, Karony told investors that he was "getting paid a little bit . . . just so we can cover the bills." GX-3000-A. This was misleading at the very least: Agent Petrower traced approximately $9.9 million Karony obtained from the LP for personal benefit. Tr. 1993:21-94:5; *see also id.* at 1992-93 (tracing approximately $5 million in withdrawals for personal benefit for Nagy and nearly $3 million for Smith).

As to the AMA disclosures, Karony points to two in particular. First, during the AMA from March 25, 2021, Hank Wyatt, a former SafeMoon employee who helped moderate the AMAs, read a question from a viewer as to whether the LP tokens currently being generated were locked. GX-3002-A. Smith replied that "either during this video right now or minutes after, we're gonna be locking whatever extra LP that we've generated over time." *Id.*; Reply 4. Karony argues that this statement was true — as his expert Professor Bruce Mizrach testified, SafeMoon locked the LP that same day – and functioned as a disclosure that the LP could be (and had previously been) unlocked. Tr. 2377 (Mizrach).

Even if the locking announcement did disclose that the SafeMoon developers had some prior access to the LP, the

13

evidence showed that Karony and his co-conspirators only made this announcement several weeks *after* they had already withdrawn from the LP. As Special Agent Petrower demonstrated at trial, the SafeMoon developers made twelve withdrawals from the LP prior to March 25, including a $100,000 withdrawal on March 14 and a $90,000 withdrawal on March 15. GX-6006, at 5; Tr. 1803:2-20. By the time of this AMA, the ship had sailed; they had already withdrawn LP funds. And the locking statements were misleading on their own terms: after "locking" the LP, Karony and his co-conspirators continued to access it at will, often within days of these announcements. GX-1042-9 (Karony's April 1, 2021, request to withdraw $35,000 from the LP); Tr. 646:16-20 (Smith); *see* GX-3006-A (AMA also announcing locking of the LP).

Karony also points to an AMA from April 21 in which he and Smith addressed the "War on Rugs" tweet. *See* GX-3006-A. After acknowledging investor "questions regarding the liquidity pool," Karony read from part of a series of tweets he posted earlier that day. *Id.*; *see* GX-7001-L2 to -L7. Karony said that the SafeMoon developers "may" access the LP in limited instances, including for "development costs" or to "seed other exchanges."[6] GX-3006-A. He went on to state that SafeMoon did not "foresee a need, you know, in the future" to do so. *Id.*

---

[6] Seeding exchanges refers to launching SFM on other crypto exchanges, including by creating liquidity. Tr. 566:22-25 (Smith).

According to Karony, this functioned to disclose that the SafeMoon developers could access the LP for business-related purposes.  Reply 5.

The evidence, however, was more than sufficient to find that the April 21 AMA statements further misled investors as to the purpose for which the developers accessed the LP. Contrary to tapping the LP for SafeMoon development costs or to seed exchanges, Karony himself used the LP to purchase, among other things, multiple supercars, three real properties, and other luxury goods.  Tr. 1973:20-24, 1993:21-94:5 (Petrower); Tr. 586 (Smith).  He had discussed doing so, in private exchanges with Smith, for over a month by the time that he made the April 21 statement.  *See, e.g.*, GX-1042-2 (March 15 Discord exchange where Karony and Smith discuss buying luxury automobiles); GX-1042-8, at 4 (March 28 exchange discussing using LP funds for "real estate").  And within weeks of saying SafeMoon did not "foresee a need" to use the LP, GX-3006-A, Karony and his co-conspirators continued to withdraw.  GX-6006, at 11 (seven LP withdrawals in May, many for several million dollars each); Tr. 1832-33 (Petrower).

In a similar vein, Karony argues that in another tweet from April 21, he accurately represented that SafeMoon would inform investors, in advance, if they were going to use the LP. GX-7001-L-6.  Karony tweeted that the LP is a "last resort," and

before withdrawing, the SafeMoon developers would "publicly go to the community and let you know if the LP will be used and what for, ahead of time." *Id.*; Reply 5. But evidence was more than sufficient to find that this and similar tweets were false. The SafeMoon developers did not "publicly go to the community" before withdrawing from the LP, but made withdrawals following discussions in their private Discord messages.[7] *See* Tr. 485, 505:2-13 (Smith); GX-1042-7 (Karony's March 21, 2021, request to "exit" LP funds).

> *Materiality.* Next, Karony argues that the government failed to establish the materiality of the statements concerning the LP. Karony contends that the "purported misstatements" did not go to the "heart of the bargain" because SafeMoon did not represent that "all newly generated LP tokens would be locked automatically upon generation." Reply 8-9.

> As addressed above, the conspirators did make a representation almost identical to that one on the SafeMoon website. *See supra* 11-12 (citing GX-8000). More to the point, investors testified that the representations regarding a locked LP were important to their decision to invest. *See* Tr. 1347:22-

---

[7] Karony also contends that the evidence was inadequate to show he knew that the funds were being withdrawn from the LP. But evidence showed that Karony and Smith discussed using the LP funds directly. *E.g.*, GX-1042-8, at 1-2 (March 23, 2021 Discord chat where Smith told Karony that "we shouldn't empty the lp" because it could significantly impact the value of SFM).

48:7 (Uhric); *id.* at 1257:1-16 (Sutton).   Numerous investors
explained that the assurances a locked LP provided against a
"rug pull" impacted their decision to purchase SFM.   *E.g.*, Tr.
275:17-76:11 (Olshansky), 1251:1-53:24 (Sutton).   Investor
witnesses also testified that if they knew Karony and his co-
conspirators could withdraw LP assets for personal spending,
they would not have invested at all.   *E.g.*, Tr. 278:18-79:16
(Olshansky), 895:11-96:12 (George); 979:14-20 (Bukowski);
1037:25-38:16 (Wyatt).

Karony also argues that many investors bought SFM on
BitMart, which "undermined the materiality case" because "there
was no liquidity pool" there.   Reply 9.   As outlined above,
however, SafeMoon advertised that SFM tokenomics would be
replicated for BitMart volume.   *E.g.*, GX-3003-A, GX-3004-B.
Under the stated protocol, BitMart would send payments to the
SafeMoon developers to account for the 10% tax, half of which
SafeMoon was supposed to deposit back into the LP.   GX-6001;
Tr. 481-83 (Smith).   However, the SafeMoon developers did not
consistently deposit these payments the LP and used at least
some of them for personal purchases, contrary to their
representations otherwise.   Tr. 2016:11-16, 2017:9-16
(Petrower); *id.* at 482-83, 517 (Smith).   The evidence was more
than adequate for a jury to find these representations material:
multiple investor-witnesses who purchased on BitMart testified

that the promise of SFM tokenomics there was important to their decision to invest, including to prevent a rug pull.  Tr. 55:13-19, 56:1-18 (Maurer); *id.* at 1347:1-11 (Uhric).

**Existence of an Agreement.**  Then, Karony argues that evidence did not "show Karony's *agreement* to join a scheme or artifice to defraud with the specific intent to defraud victims of money or property."  Reply 9.  Karony contends that he and Smith did not have an agreement to withhold information from SafeMoon investors about the LP, and that the evidence did not establish the terms of any agreement between Karony and his alleged co-conspirators.  *Id.*

On this point, the Court instructed the jury that it could "infer the existence of a conspiracy from the circumstances of this case and the conduct of the parties involved.  In a very real sense, . . . in the context of conspiracy cases, actions often speak louder than words."  Tr. 2761:2-6.

The co-conspirators' actions easily sufficed to allow that inference.  Moreover, the government did not have to stand on conduct evidence alone in this case.  The government introduced numerous online conversations in which Karony and his co-conspirators discussed withdrawing from the LP and concealing those withdrawals from investors.  On March 15, 2021, for example, Karony and Nagy discussed in a Discord chat whether

18

they should be "honest" about accessing the LP.  GX-1044-3.  The next day, Smith messaged Karony that he "just told a bunch of people we probably wouldn't" access the LP.  GX-1042-2.  Smith testified that after this conversation, he and Karony decided to "bury" the fact that the SafeMoon developers could access the LP at will.  Tr. 367:8-13.  In another exchange, Karony expressly directed Smith *not* to disclose to investors their access to the LP.  *E.g.*, GX-1042-4, at 2 (March 17 exchange; Karony tells Smith to "make you sure specify we wont touch the LP").  Despite representing to the public that the SafeMoon developers were not accessing the LP, Karony told Smith that Smith "could withdraw" "[s]omewhere between 400 and 700,000 dollars" a month from the LP to "keep for [him]self."  Tr. 362:12-63:2 (Smith).

Karony also asserts that the government did not prove an agreement as to the sale of SFM on BitMart because "the government adduces no BitMart 'co-conspirator.'"  Reply 9.  But evidence showed that Karony and Smith coordinated in the BitMart scheme.  As Smith testified, to generate an adequate supply of SFM for trading on BitMart, Karony directed Smith to withdraw SFM-BNB token pairs from the LP.  Tr. 466:6-22, 467:6-12, 473, 478.  Again at Karony's request, Smith then sent *just* the SFM part of the pair to BitMart — but he and Karony retained the BNB tokens and used them for bonuses, among other things.  Tr. 467:6-9, 469:15-20.  As Smith testified, they did not tell

investors about this because "withdrawing liquidity"
contradicted their "public announcements" as to how the token
was supposed to function.  Tr. 467:15-18.  Among other things,
Karony stated on several AMAs — with Smith present, as usual —
that BitMart would implement SFM tokenomics, including its
primary LP features.  *See* GX-3003-A (April 1 AMA); GX-3004-B
(April 4 AMA).  Based on this and similar evidence, a reasonable
jury could find that Karony acted with Smith to misrepresent how
they would use LP in connection with the BitMart exchange.[8]

## B.  Sufficiency of Evidence as to a Securities Transaction (Count I)

Next, according to Karony, the evidence failed to
establish that SFM was a security.  Reply 8.  On this point, the
jury needed to find: (1) "the investment of money"; (2) "in a
common enterprise"; (3) "with a reasonable expectation of
profits to be derived from the efforts of others."  *Id.* at
2767:24-68:2; *see SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99
(1946).  To satisfy the second element, the Court instructed
that the government needed to prove horizonal commonality, or a
"tying of each individual investor's fortunes to the fortunes of

---

[8] Karony also adds the argument, in one sentence, that the government's
evidence as to the BitMart scheme was either a constructive amendment or
fatal variance.  Reply 9.  This argument is unavailing.  First, Karony raises
it for the first time in his reply, which is "reason enough" to reject it.
*George*, 779 F.3d at 119.  In any case, the indictment gave Karony "notice of
the core of criminality to be proven at trial," *United States v. Heimann*, 705
F.2d 662, 666 (2d Cir. 1983), including as to the BitMart scheme.  *See*
Indictment ¶¶ 56-59 (alleging that Karony and his co-conspirators misled
investors as to the purchase of SafeMoon on "Crypto Exchange 2").

[the] other investors by the pooling of assets." Tr. 2768:24-69:2. For the third element, the Court instructed that the jury could consider, among other things, "whether SafeMoon used promotional materials, or otherwise marketed [SFM] to emphasize opportunities for potential profit." *Id.* at 2769:11-14.

Karony argues that the SFM token came with no "contractually-grounded expectation of future value." Reply 8. He also argues that because SFM "tokenomics was automated," investors could not have an expectation of profits derived from the efforts of Karony and his co-conspirators. Reply 8.

The evidence was more than sufficient for the jury to find the *Howey* test satisfied. First, SFM investors invested money into SFM when they exchanged U.S. dollars or BNB for SFM tokens. Tr. 41:1-10 (Maurer); 269:10-15 (Olshansky). As to a common enterprise, each investor's fortune was tied to others' fortunes, *see Revak v. SEC Realty Corp.*, 18 F.3d 81, 88 (2d Cir. 1994), because (among other things) half of the 10% tax went to the liquidity pool, which was intended to benefit all token holders. GX-8002, at 5; Tr. 244-45 (Smith).

SFM investors also had a reasonable expectation of profits to be derived through the efforts of Karony and his co-conspirators. Investors testified that they expected their SFM holdings would increase in value because of the LP and reflection payments, which the co-conspirators managed on an

ongoing basis. *See, e.g.*, Tr. 275:17-76:11 (Olshansky) 1251:1-53:24 (Sutton). The evidence demonstrated that these expectations were reasonable: Karony and his co-conspirators represented that SafeMoon was a secure investment because of its tokenomics and locked LP. Tr. 321:4-12 (Smith); GX-8000 (SafeMoon website); GX-8002, at 5 (referring to Automatic LP as SafeMoon's "secret sauce"). Finally, contrary to Karony's argument that SafeMoon advertised itself as fully "automated" token with no managerial intervention, the evidence showed otherwise. Karony and his co-conspirators presented their management of the liquidity pool as critical to making SafeMoon a success. They did so through frequent AMAs, where they discussed the value of locking the LP, as well as tweets explaining how SafeMoon would use the LP for "future SafeMoon innovations." *E.g.*, GX-3003-A (April 1, 2021 AMA); GX. 7001-L-5 (Karony tweet about using LP for development costs).

## C.  Sufficiency of Evidence as to Count III (Money Laundering Conspiracy)

Karony next contends that the evidence was insufficient to establish any element of money laundering. He focuses primarily on the contention that the government presented no evidence of "domestic money laundering" in violation of 18 U.S.C. § 1956(a)(1). Reply 10 ("No evidence proved an agreement to commit domestic money laundering, and the

government failed to charge predicate international laundering.").

On this point, the Court instructed the jury that the government needed to prove that the financial transactions at issue "in some way or degree" affected interstate *or* foreign commerce.  Tr. 2788:23-25.  The Court explained, "[i]nterstate commerce includes any transmission or transfer between persons or entities located in different states, and foreign commerce means the same thing, except it is between a person or entity in the United States and a person or entity in a foreign country, and the government satisfied its burden if it proves any effect or involvement, regardless of whether it was beneficial or harmful."  Tr. 2790:13-25.

The evidence was sufficient to demonstrate that the transfers from the LP affected interstate commerce.  Karony and his co-conspirators removed assets from the LP to anonymous crypto wallets, transferred those assets into personal bank accounts, and used them to purchase properties and cars, among other things, in various states.  *E.g.*, Tr. 1968-71, 1980 (Petrower); GX-6006, at 51-53.

## D.    Argument Challenging Venue Against All Counts

Finally, Karony levels the argument — against all counts — that there was insufficient evidence to establish venue in the Eastern District of New York.  Reply 10.  Karony argues

that the government did not establish that a dinner between him and a BitMart representative in New York furthered any of the charged conspiracies, but he does not otherwise develop his argument as to venue.  Reply 10.

The government must prove venue by a preponderance of the evidence.  *See United States v. Ramirez*, 420 F.3d 134, 139 (2d Cir. 2005).  Venue is proper in "a district where the offense was committed."  Fed. R. Crim. P. 18.  For a conspiracy offense, as all three offenses are here, "venue is proper in any district in which an overt act in furtherance of the conspiracy was committed by any of the coconspirators."  *United States v. Geibel*, 369 F.3d 682, 696 (2d Cir. 2004).

The evidence was sufficient for a reasonable jury to find that numerous overt acts on each count occurred in this District.  SFM targeted potential investors in New York, and at least one investor first learned of SafeMoon while living in this District.  Tr. 1337-38 (Uhric).  Karony also traveled through John F. Kennedy Airport to meet with Chad Liang, a BitMart representative.  GX-10016 (Karony flight records); GX-10012-E (Karony and Liang messages).  The government introduced a message exchange indicating the meeting in fact occurred.  *See* GX-10012-E, at 62-63.  This and other evidence sufficed to establish venue was proper in this District.

### III. Conclusion

For the reasons outlined above, the defendant has not shown that no reasonable jury could have found him guilty on all three counts of conviction. Accordingly, the defendant's Rule 29 motion is denied.

SO ORDERED.

/s/ Eric Komitee
ERIC KOMITEE
United States District Judge

Dated:    February 1, 2026
          Brooklyn, New York