UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------x

 UNITED STATES OF AMERICA,

           -against-                          **MEMORANDUM & ORDER**
                                                   23-CR-433
 BRADEN J. KARONY,

                    Defendant.

--------------------------------------x
ERIC KOMITEE, United States District Judge:

          Defendant Braden Karony was convicted, following a

jury trial, of having participated in three criminal

conspiracies.  In February, the Court sentenced Karony to 100

months of incarceration and imposed an order of forfeiture, but

deferred calculation of any restitution due.

          The government now seeks an award of $3,347,046.66,

plus interest.  The defendant contests that figure on several

grounds.  For the reasons set forth, the defendant is ordered to

pay restitution in the full amount sought, the components of

which are described below.[1]

### I.   Background

### A.   Karony's Conviction and Sentencing

          Karony was convicted of conspiracy to commit

securities fraud (Count One), conspiracy to commit wire fraud

---

[1] Separately, the government seeks the forfeiture of certain previously
restrained funds as a substitute asset in partial satisfaction of this
Court's January 18, 2026 Preliminary Order of Forfeiture.  *See* Prelim. Order
of Forfeiture, ECF No. 277.  That motion is also granted.

(Count Two), and conspiracy to commit money laundering (Count Three).  Jury Verdict, ECF No. 198.  Following trial, he moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29.  The Court denied that motion.  *United States v. Karony*, No. 23-CR-433, 2026 WL 254262, at *9 (E.D.N.Y. Feb. 1, 2026).  This order assumes familiarity with the facts set forth in that order.

The defendant was the CEO of SafeMoon LLC, a company that created a cryptocurrency (the SafeMoon token, or "SFM").  *Id.* at *1.  Karony and his co-conspirators launched SFM in early March 2021 and promoted it as a safe investment.  *Id.*  The token proved the opposite, losing nearly its entire market capitalization by January 2022.  GX-10004 (chart showing SFM's price in U.S. dollars between March 2021 and January 2022).

In that period, Karony and his co-conspirators misrepresented key aspects of SFM's "tokenomics" — the token's features and the terms pursuant to which it would be traded.  Prominent among these features was a "liquidity pool."  SafeMoon billed the liquidity pool as a reserve of tokens established to ensure that SFM purchasers would be able to exchange their tokens for a different cryptocurrency when they wished to exit their SafeMoon positions.  Among other things, the conspirators represented that the liquidity pool would be "locked" — i.e., that the SafeMoon developers would not be able to help

2

themselves to its contents at will.  Despite this representation, Karony and his co-conspirators repeatedly withdrew assets from the liquidity pool for their personal benefit.

Following Karony's conviction, the government invited SafeMoon purchasers to complete affidavits of loss — forms requesting their names and amounts of purchase, as well as other details.  At sentencing, the government stated that it was continuing to receive such affidavits, and the defendant contested the government's proposed method for calculating restitution.  Sent'g Tr. 76, ECF No. 287; *see* Def. Sent'g Br. 11-12, ECF No. 257.[2]

The defendant raised three primary objections to the government's proposed restitution calculation.  Def. Sent'g Br. 11-12.  First, he argued that the government had failed to exclude losses attributable to the broader cryptocurrency markets rather than the defendant's fraud.  Def. Sent'g Br. 12. Second, he complained that the affiants affirmed only that they purchased SafeMoon — *not* that they relied on the defendant's misrepresentations.  *Id.*  Third, he argued that the government improperly sought restitution for losses incurred on a later version of SafeMoon known as SafeMoon V2 ("SFM V2").  *Id.*

---

[2] All page number citations in this order to party submissions, as well as transcripts, refer to native, not ECF, pagination.

Relevant here, SafeMoon V1 (the initial version of SFM, or "SFM V1") was available for purchase between March 8, 2021, when SafeMoon was traded publicly, and December 29, 2021.  Affidavit of Thomas Magbee 2 ("Magbee Aff."), ECF No. 296-1.  On that later date, the SafeMoon developers made SFM V1 inoperable and allowed SFM holders to convert their holdings to SFM V2.  According to the defendant, SFM V2 was only available for purchase *after* the conspiracy concluded, such that V2 purchasers were not entitled to restitution.  Def. Sent'g Br. 12.

In light of these disputes, the Court deferred decision on restitution, ordered supplemental briefing, and held a hearing on April 23, 2026.  Dkt. Order dated Feb. 10, 2026; Restitution Hr'g Tr., ECF No. 314.

Following sentencing, the government modified its approach.  Gov't Ltr. on Proposed Order of Restitution 1, ECF No. 296; Proposed Order of Restitution, Ex. A, ECF No. 316-2.  It now seeks restitution only for purchases of SFM V1.  Gov't Ltr. 2.  It also requested all individuals who submitted an affidavit to submit a supplemental affidavit, which asked whether they purchased SafeMoon in reliance on one of several specified statements.  In addition, the government submitted an expert report that attempts to distinguish losses in SafeMoon caused by the defendant's fraud from those caused by general

4

market forces.

**B.    The Government's Methodology for Calculating Restitution**

The government seeks an order reflecting the purchase price that 220 SafeMoon purchasers paid for SFM V1, less any amount they recouped from selling their holdings, as adjusted for broader market declines.  Gov't Ltr. 1.

In calculating its proposed restitution figure, the government attempted to control for declines in the broader market for cryptocurrencies, so as to isolate SFM-specific damages.  *Id.* at 2.  It retained Integra FEC ("Integra"), a forensic data analytics and financial consulting firm.  The government furnished an affidavit from Integra Director Thomas Magbee, an expert in cryptocurrency tracing and valuation, outlining his methodology.  Magbee compared the performance of SFM between March and December 2021 with that of the Binance coin ("BNB"), a more established and liquid token.  Magbee Aff. at 3-4.  According to Magbee, BNB serves as a reasonable proxy for the broader crypto market for a number of reasons: it was the "native" coin on the BNB exchange where SFM was available for trading; it was in the top ten cryptocurrency assets in 2021 based on market capitalization; and it was relatively mature at the time, having been in circulation for about four years when SafeMoon launched.  *Id.*

To facilitate Magbee's calculation, the government

provided him a spreadsheet containing information extracted from the loss affidavits.  *Id.* at 1.  The initial affidavits requested that each affiant specify: the date(s) of her purchase; the total amount she purchased of each SFM V1 and V2[3]; whether she sold her SFM, and if so, how much she received from such sale(s).  They also required the affiant's full name, address, telephone number, and email address, and called for signature indicating that the affiant "swear that the above information is true and accurate."  *E.g.*, AB-1 Aff., Karony_Res_1048.

Magbee calculated each purchaser's loss by taking the amount of SFM V1 purchased less what she "received from sales" of her holdings.  Magbee Aff. at 2.  He calculated this sum in the currency the affiant used to purchase SFM.  Next, he compared the loss with the performance of BNB over a specified period.[4]  After identifying the BNB return in the relevant interval, he adjusted each purchaser's loss to reflect any percentage decline in BNB.  So, if a purchaser's gross loss was $100, and BNB decreased by 5% in the relevant interval, Magbee reduced the restitution figure by $5.  If the BNB return was

---

[3] As explained above, purchases of SFM V2 were excluded from the restitution calculation.

[4] That period ran from the date of the SFM purchase to December 29, 2021 (the last day on which SFM V1 was tradeable) — regardless of whether the purchaser continued to hold until that later date.  Magbee Aff. at 3.  Thus, the comparison period for BNB performance was a rough, not precise, proxy for the purchaser's actual holding period.

positive, the restitution figure went unchanged.  *Id.* at 3.[5]

Magbee submitted a spreadsheet as an attachment to his affidavit, which shows his calculations and lists an adjusted restitution figure for each purchaser.  Magbee Aff. Appendix ("App'x") A; *see* Proposed Order of Restitution, Ex. A, ECF No. 316-1.  For affiants who purchased SFM with a non-U.S. currency, Magbee converted the dollar loss into U.S. dollars.  *Id.* at 4.[6]

Following the sentencing hearing, the government followed up with each person who submitted an initial affidavit, asking that they furnish a supplemental affidavit as well.  These asked the affiant whether, "[i]n deciding whether to transact . . . SafeMoon V1 token," she:

> rel[ied] on the accuracy of any of the following statements by the defendant and other members of the Safemoon team — (1) assets from Safemoon's liquidity pool would only be used as a last resort for business purposes; (2) Safemoon's team would tell investors before using assets from the liquidity pool; (3) Safemoon was not a rug pull; and/or (4) Safemoon was implementing tokenomics on Bitmart.

*E.g.*, AB-2 Suppl. Aff., Karony_RES_1143.[7]  These affidavits also called for a signature indicating that the affiant "swear[s]

---

[5] Certain affidavits listed a date *range* in the field calling for the date of the initial SFM purchase.  For these, Magbee calculated the BNB starting price by averaging BNB's price across every trading day in the given range.  Magbee then determined the BNB return between that average and its value on December 29.  *Id.*

[6] Again, there was some imprecision in this conversion: Magbee used the currency conversion rate prevailing on March 19, 2026 — several years after the actual holding period.  *Id.*

[7] BitMart refers to another exchange where SFM was available for purchase.  *See Karony*, 2026 WL 254262, at *2.

that the above information is true and accurate."  *Id.*  Of the 220 victims who submitted initial affidavits, 211 submitted supplemental affidavits — and all of those responded affirmatively.  Magbee Aff. App'x A.

## II.  Discussion

The Mandatory Victims Restitution Act of 1996 ("MVRA") requires a defendant convicted of an "offense against property" under Title 18, "including any offense committed by fraud," to pay restitution.  18 U.S.C. § 3663A(c)(1)(A)(ii).  The defendant's securities and wire-fraud conspiracy convictions qualify as such.

The government bears the burden to establish "the amount of the loss sustained by a victim as a result of the offense."  *Id.* § 3664(e); *see United States v. Gushlak*, 728 F.3d 184, 195 (2d Cir. 2013).[8]  Under the MVRA, a "victim" is "a person directly and proximately harmed as a result of the commission of an offense."  18 U.S.C. § 3663(a)(2).

Because restitution is compensatory, victims may only recover their "actual loss."  *United States v. Marino*, 654 F.3d 310, 319-20 (2d Cir. 2011); *see* 18 U.S.C. § 3664(f)(1)(A) ("[T]he court shall order restitution to each victim in the full amount of each victim's losses . . . .").  To establish loss,

---

[8] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

the government must set forth "a reasonable approximation of losses supported by a sound methodology."  *Gushlak*, 728 F.3d at 196.  That estimate does not, however, need to be "mathematically precise," particularly when an "exact dollar amount is inherently incalculable."  *Id.* at 195-96.  Any dispute as to restitution "shall be resolved by the court by the preponderance of the evidence."  18 U.S.C. § 3664(e).

## A.    The Loss Affidavits

In challenging the restitution request, the defendant argues first that loss affidavits are an insufficiently reliable method for identifying victims and losses.  Def. Ltr. 1-2, ECF No. 300.  He argues that "[m]any of the affiants did not attach proof of ownership records," Def. Sent'g Br. 12, or "corroborate [transaction dates] with evidence."  Def. Ltr. 1.

The Court may rely on loss affidavits that carry "sufficient indicia of reliability to support [their] probable accuracy."  *United States v. Schwamborn*, 542 F. App'x 87, 88 (2d Cir. 2013); *see United States v. Ibanez*, 924 F.2d 427, 430 (2d Cir. 1991) ("[I]n many circumstances . . . affidavits of witnesses are themselves sufficient to resolve [a] dispute.").  Relevant "indicia of reliability" include whether the affidavit was sworn and notarized; specified the date when the security was purchased; or listed the amount invested.  *Schwamborn*, 542 F. App'x at 88.

The affidavits submitted are sufficiently reliable under this standard, even if they are imperfect.  They require each affiant's name and address, thereby providing a mechanism to verify identity.  They do not require notarization, as some affidavits found reliable did*.  See id.*  They do, however, call on affiants to swear to the veracity of their submissions.  *See United States v. Kinney*, 684 F. App'x 73, 75 (2d Cir. 2017) (finding affidavits that were sworn, though not notarized, sufficiently reliable); *see also United States v. Romano*, No. 09-CR-170, 2022 WL 2666914, at *9 (E.D.N.Y. July 11, 2022) (same), *aff'd*, No. 15-992 et al., 2022 WL 17097587 (2d Cir. Nov. 22, 2022).  Taken together, these features raise at least the specter of criminal prosecution for any affiant making a false statement.  Further, affiants provided details concerning the value and date of their purchase(s).  Such attributes collectively provide the "indicia of reliability" that is required.  *See Schwamborn*, 542 F. App'x at 88.

Defendant counters that the affiants should have been required to provide "supporting documentation establishing proof of ownership."  Def. Ltr. 1-2.  That argument finds no support in the law.  *See United States v. Hall*, 467 F. App'x 47, 49 (2d Cir. 2012) (holding that even "production of affidavits" themselves "is not required").

**B.    Loss Causation**

Karony next argues that the government has not established that the defendant's offense conduct caused the victims' losses, as required under the MVRA.  He argues that the government (1) has not adequately accounted for market forces that could have contributed to purchaser losses, and (2) failed to show *which* misrepresentations caused specific purchaser losses.  Def. Ltr. 3-5.  Both arguments concern loss-causation principles developed in civil securities fraud cases, and we consider the law developed in those cases as well.  *See United States v. Leonard*, 529 F.3d 83, 93 n.11 (2d Cir. 2008) (courts "may look to principles governing recovery of damages in civil securities fraud cases" when calculating losses in a criminal case).

1.    Confounding Causes

The defendant first argues that the government's proposed restitution figure does not adequately account for broader market factors that could have contributed to purchaser losses.  Restitution Hr'g Tr. 27-28 (arguing that BNB is an inadequate control for the broader cryptocurrency market); *see* Def. Sent'g Br. 11-12.  The government counters that it is not required to account for market forces, but that in any case, its methodology adequately does so here.  Gov't Ltr. 3-4.

"In determining the proper amount of restitution, a

11

court must keep in mind that the loss must be the result of the fraud." *United States v. Paul*, 634 F.3d 668, 676 (2d Cir. 2011).  However, when the defendant promotes a security that is essentially "worthless," all purchases of it are attributable to the fraud — and the government is *not* required to distinguish market forces.  *United States v. Rutkoske*, 506 F.3d 170, 180 n.4 (2d Cir. 2007); *see also United States v. Ageloff*, 809 F. Supp. 2d 89, 101 (E.D.N.Y. 2011) (holding, for purposes of restitution, that securities at issue were worthless because "no one would have bought" them, and the "actual posted price would have plummeted to zero or near-zero levels" if investors knew about the fraud), *aff'd sub nom. United States v. Catoggio,* 698 F.3d 64 (2d Cir. 2012).  In contrast, when a party manipulates a stock that *does* have some value, the government must discount market forces.  *Rutkoske*, 506 F.3d at 173, 180 (holding that stock losses in an internet start-up were at least partly attributable to market forces where defendant manipulated price through high-pressure sales tactics); *see also Gushlak*, 728 F.3d at 199 (same).

When, as here, an asset's market price falls catastrophically during the conspiracy, it is reasonable to start from the proposition that 100% of purchaser losses flowed from the fraud.  GX-10004 (SFM lost over half its value over three primary periods during the conspiracy); *see Ageloff*, 809

12

F. Supp. 2d at 101.  A precipitous decline when the market is alerted to the fraud (even if only partially) may also tend to indicate that the asset's market price was a product of the fraud.  *See Ageloff*, 809 F. Supp. 2d at 101 n.13 (asset lost three quarters of its value after market manipulation ended). SafeMoon followed this pattern: its market valuation fell by over half when a Twitter user known as "War on Rugs" revealed in April 2021 that Karony and his co-conspirators were withdrawing from the liquidity pool.  *Karony*, 2026 WL 254262, at *5-6.  And, in December 2021, after trading for approximately ten months, it fell nearly to zero.  GX-10004.  Trial evidence also showed that, without a locked liquidity pool that operated as promised, the asset was essentially "worthless."  Trial Tr. 240 (co-conspirator Thomas Smith).  As numerous witnesses testified, they would not have purchased SFM at all had they known that Karony or the conspirators could withdraw from it at will. *E.g.*, *Id*. at 278:18-79:16 (Olshansky), 895:11-96:12 (George); 979:14-20 (Bukowski); 1037:25-38:16 (Wyatt); 1347:1-11 (Uhric). This testimony is unsurprising: as the Court held in its Rule 29 order, the defendants' decision to help themselves to purportedly "locked" assets in the liquidity pool was akin to theft.  In such circumstances, the government need not account for market forces.  *See Rutkoske*, 506 F.3d at 180 n.4.

Nevertheless, the government has attempted to account for

13

such forces here, and it has done so with sufficient precision.

The "extent to which a defendant's fraud, as distinguished from market or other forces, caused shareholders' losses inevitably cannot be an exact science." *Id.* at 179. In the context of common stock, the court need only "approximate the extent of loss caused by a defendant's fraud," such as by comparing the entity at issue with "shares of comparable companies." *Id.* at 179-80. When the government furnishes an expert report that identifies a control for the broader market, that expert has some latitude in identifying "companies he deem[s] similar" to the asset at issue. *Gushlak*, 728 F.3d at 199.

Magbee's use of BNB adequately accounts for market factors — even if (as noted above) he incorporated a timing mismatch between some periods of SFM ownership and BNB performance. BNB and SFM traded in a similar class of cryptocurrency assets: both were high-volume; both operated on the same exchange; and the two coins helped "manage each other's value" within the liquidity pool. Trial Tr. 240, 542 (Smith); Magbee Aff. at 3-4; *see Gushlak*, 728 F.3d at 199. And as a more established, more heavily traded token, BNB's performance would have been more tightly correlated to the broader crypto market than SFM's was.

BNB is a sound control for an additional reason: the

SafeMoon developers selected it as the other token in the liquidity pool's token pair, allowing SFM holders to exchange SFM for BNB whenever they chose. *Karony*, 2026 WL 254262, at *2. In doing so, the developers *themselves* impliedly recognized BNB as a good proxy for the broader market — something that SFM holders would be happy to obtain when they elected to reduce SFM-specific risk. These attributes, taken together, make BNB a compelling control for the broader cryptocurrency market.

The defendant suggests that the government should have used a different control. But he frames that preference in vague terms, saying that the expert should have looked to "tokens that had similar kinds of performance" to SFM. Restitution Hr'g Tr. 29-30 (arguing that the "Cake" and "Banana" tokens better resemble SFM because of the "way they came over to the market" and the "time frame" in which they were traded). Even if Karony had made this argument with more specificity, it would fail. *See Gushlak*, 728 F.3d at 196 ("[If a] basis for reasonable approximation is at hand, difficulties in achieving exact measurements will not preclude a trial court from ordering restitution."). The comparison of BNB's performance with that of SFM suffices under this standard — and in any case, redounds to the benefit of the defendant by reducing certain victim losses.

15

2.    Impact of Specific Misrepresentations

Karony next contends that Magbee should have conducted an event study to determine how specific misrepresentations negatively impacted SFM's value.  Def. Ltr. 5.  He points to the misrepresentations in the supplemental affidavits, arguing that Magbee "does not compare *when* the [defendant's] 'false statements' were made with an investor's purchase date or with price drops."  *Id.* (asserting that the government "fails to account for the fact that they were made at different (unspecified) times and with price effects ranging from nil to significant").

An event study is "a method frequently used in securities litigation to estimate the specific impact of a particular disclosure on a security's price."  *Gruber v. Gilbertson*, 628 F. Supp. 3d 472, 481 n.4 (S.D.N.Y. 2022).  Event studies require the identification of an "event window," or a period when relevant information was disclosed to the market. *Id.*  Once that window is identified, an expert can measure how the security price would be expected to move in response to general market movements and compare that movement with how the stock actually moved considering the relevant event.  *Id.*

An event study is typically not required to determine

loss causation under the MVRA.[9]  *Gushlak*, 728 F.3d at 201; *see*

*Watts v. United States*, Nos. 21-2925, 21-3028, 2023 WL 2910634,

at *2 (2d Cir. Apr. 12, 2023) ("[W]e have not generally required

the kind of 'event study' used in the securities litigation

context to disaggregate loss amounts in the restitution

[context].").  In *Gushlak,* the government's expert used a

regression analysis to calculate the price of a company's stock

"but for the [defendant's] price manipulation."  728 F.3d at

198.  The defendant contested this method, arguing that an event

study was required.  The court held that a "fine-grained event

study" that considers "each particular fraudulent act" might be

justified in a case involving a "series of blips [or] slight

departures from what the market would predict."  *Id.* at 201-02.

But when the "only relevant company-specific factor was fraud,"

an event study is not required.  *Id.*

An event study was not necessary (or particularly

practical) here.  Karony's and his co-conspirators'

misrepresentations and omissions began even before the asset's

launch, and continued throughout the relevant period.  *Karony*,

2026 WL 254262, at *5-7; *see also* Tr. 338-39 (Smith testifying

that the "pre-sale" of SFM, which occurred before it was

---

[9] In the civil securities context, "courts [have also] recognized the limitations of using event studies to establish 'direct' evidence of market efficiency," particularly when conducting "single-firm analyses."  *See In re Vale S.A. Sec. Litig.*, No. 19-CV-526, 2026 WL 670149, at *4 (E.D.N.Y. Mar. 10, 2026) (collecting cases).

publicly tradeable, enabled SafeMoon developers to obtain "a large amount of tokens").  Thus, no expert could have identified the requisite control period *prior* to the relevant event(s), i.e., the misrepresentations.  Magbee Suppl. Aff. at 4, ECF No. 302-2 ("Since there is no [period] prior to false statements being made and because the false statements existed throughout Safemoon V1, an event study is inappropriate . . . .").  In any case, the trajectory of SafeMoon's price was far from the "blips" or "slight departures" that would justify an event study — to the contrary, its share price experienced three surges in value (in April 2021, May 2021, and November 2021), each of which was followed by a loss of over half its value.  *See* GX-10004.  Under these circumstances, an event study is not required.  *See Gushlak*, 728 F.3d at 201-02.

## C.    Individual Reliance

Karony next argues that the government is required to show that each victim relied on the misrepresentations at issue, and that it has failed to do so.  Def. Ltr. 3 (asserting that "the Court will not be able to review any affidavit and determine whether the investor relied on a false or true statement (or on one without any truth value)").  The government responds that it is not required to prove individual reliance and that, even if it were so required, it has done so.  Gov't

Ltr. 4-5.

### 1.    Whether Individual Reliance Is Required

The Second Circuit has visited this complex issue — of when and how victims' reliance should be considered in awarding restitution in fraud cases — on multiple occasions. *E.g.*, *Marino*, 654 F.3d 310. Because of its complexity, it is worth stepping back to first principles. In *criminal* cases of securities and crypto fraud, the government need not prove reliance at all to establish the defendant's guilt. *See, e.g.*, *United States v. Vilar*, 729 F.3d 62, 88 (2d Cir. 2013) ("Reliance, however, is not an element of a criminal case brought by the government under Section 10(b) or Rule 10b-5.").[10]

The concept of reliance nevertheless arises in the restitution analysis. It does so under the rubric of proximate causation. As noted above, purchasers are entitled to restitution only for losses directly and proximately caused by the crime of conviction. 18 U.S.C. § 3663A(a)(2); *see also* *Marino*, 654 F.3d at 317 ("Neither the [Victim Witness Protection Act] nor the MVRA explicitly defines the requisite

---

[10] The *Vilar* court went on to observe what *is* required:

> To prevail in a civil case under Section 10(b) and Rule 10b-5, the government must prove that in connection with the purchase or sale of a security the defendant, acting with scienter, made a material misrepresentation (or a material omission if the defendant had a duty to speak) or used a fraudulent device. . . . Conspicuously absent from this list of elements is "reliance."

*Vilar*, 729 F.3d at 88.

19

causation standard sufficiently to answer the question before us — *i.e.*, whether appellant's admitted offense 'directly and proximately' caused [the relevant] investors' losses.").  And as the Second Circuit observed in *Marino*, the concept of loss causation "may be used to refer to whether the particular [investor] relied upon — or is [rebuttably] presumed to have relied upon — the misrepresentation" at issue.  654 F.3d at 321. We therefore address the defense's argument that the government has not adequately established reliance.

       2.    <u>Purchasers Who Completed Supplemental Affidavits</u>

As explained above, the substantial majority of victims — 211 of the 220 — submitted supplemental affidavits in which they attested that they relied on "the accuracy of" at least one of the listed misrepresentations.  *See supra* Section I.B (listing four misrepresentations, including that "Safemoon was not a rug pull").  Karony argues that these affidavits fail to establish reliance, primarily because the four "false statements differ from the misrepresentations on which the Court denied Karony's acquittal motion."  Def. Ltr. 3.

In the civil securities context, a purchaser establishes reliance by showing "he was aware of a company's statement and engaged in a relevant transaction . . . based on that specific misrepresentation."  *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011).  Here, victims who

submitted supplemental affidavits satisfied this standard: each affiant expressly attested that she "did . . . rely" on the "accuracy of" the defendant or SafeMoon teams' misrepresentation(s) in transacting SFM — direct, compelling evidence of reliance.  *E.g.*, AB-2 Aff.  And for the same reasons explained previously, these affirmations are reliable.  *See supra* Section II.A.

And contrary to Karony's arguments, these statements were indeed proved false — materially so — at trial.  *Karony*, 2026 WL 254262, at *3, *6-7 (describing trial evidence which showed that the conspirators represented that SafeMoon was not a rug pull; that the liquidity pool would be used only as a "last resort" for "development costs"; that the developers would inform SFM holders prior to withdrawing from the liquidity pool; and "tokenomics" would be used on BitMart).  The defendant's related contention that the supplemental affidavits do not permit the Court to discern which statement an affiant relied on must fail too: reliance on any of the four suffices.  The statements are all highly related to one another and to the core of the fraud, which was (again) embedded in the sales pitch from Day One of the Safemoon operation.

Karony also argues that the supplemental affidavits fail to account for victims who purchased SFM on BitMart, a different exchange.  Def. Ltr. 5.  He contends that, because

BitMart did not host a liquidity pool, a SFM purchaser on BitMart could not be materially misled by a representation concerning SafeMoon's liquidity pool.  Def. Ltr. 5.  But the Court rejected this argument as well in its Rule 29 Order.  *See Karony*, 2026 WL 254262, at *2-3 (marshaling evidence that the SafeMoon developers represented that BitMart would "replicate" SafeMoon's key trading features, including the liquidity pool).

3.    Purchasers Who Did Not Complete Supplemental Affidavits

That leaves nine SFM purchasers who submitted original affidavits but not supplemental affidavits — and therefore have not attested to their "individual" reliance.  Their losses are compensable nevertheless, because the price at which they purchased SafeMoon was a direct function of the defendant and his conspirators' misrepresentations — about locked liquidity and otherwise.  Those misrepresentations drove demand, and that demand led to appreciation in the SFM token's price.  This, in turn, led to purchasers buying at elevated prices, whether or not they *personally* relied on those misrepresentations.

This observation is of course reminiscent of the famous *Basic* presumption.  The Second Circuit has counseled that civil securities cases "may inform, but perhaps not control, causation determinations in restitution proceedings."  *Marino*, 654 F.3d at 321.  That case law includes a well-established

exception to the requirement of individual reliance: the "fraud-on-the-market" presumption.  *See Basic Inc. v. Levinson*, 485 U.S. 224, 250 (1988).  Under it, a stock purchaser is entitled to a "presumption that he purchased the stock in reliance on the defendant's misrepresentation" if he "shows that the defendant's misrepresentation was public and material and that the stock traded in a generally efficient market."  *In re Petrobras Sec.*, 862 F.3d 250, 275 (2d Cir. 2017); *see also United States v. Ebbers*, 458 F.3d 110, 126–27 (2d Cir. 2006) (applying *Basic* presumption in a criminal case).

As set forth above, the defendant made numerous public and material misrepresentations about SafeMoon.  And SafeMoon traded at extremely high volume, and in a manner that clearly responded to the defendants' misrepresentations.  *See generally Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) (providing factors to assess market efficiency); *see also Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 207 (2d Cir. 2008).  Relevant here, SafeMoon's price reacted immediately to claims on social media that the developers were engaging in a rug pull.  *Karony*, 2026 WL 254262, at *5-6; *see* GX-10004.  SFM's trading volume was significant, reaching "the hundred-million-dollar range" on certain days.  Trial Tr. 542 (Smith); *see also* GX-10097 (chart showing consistently high daily SafeMoon trading volume throughout May 2021).  Its peak

23

market capitalization was also substantial, estimated to be at least $4 billion, and as high as $17 billion.  Trial Tr. 541:22-42:10 (Smith).  Further, the liquidity pool functioned as a market maker that constantly adjusted to reflect the prevailing market BNB-SFM price ratio, and enabled SFM holders to exit their positions at will.  *Id.* at 240 (Smith); *id.* at 135-36 (professor John Griffin, government cryptocurrency expert).

Taken together, this evidence supports the notion that Karony's (and his co-conspirators') misrepresentations drove the market price, thereby affecting even those purchasers who may not have heard them specifically.  Thus, these nine affiants, too, are entitled to restitution.

### D.    Extraterritoriality

After the government replied to the defendant's letter, Karony filed a sur-reply.  Def. Sur-Reply, ECF No. 311.  That filing was unauthorized by the Court's briefing schedule.  Sent'g Tr. 81.  It raised an argument on extraterritoriality for the first time, which is "reason enough to reject" it.  *See United States v. George*, 779 F.3d 113, 119 (2d Cir. 2015).  This argument is thus rejected on that basis.  Still, we will briefly note that argument's flaws.

Karony argues that foreign SFM purchasers "who acquired the token abroad" are not eligible for restitution.  Def. Sur-Reply 1.  He cites the Second Circuit's decision in

24

*United States v. Vilar,* which held that "restitution [was] not permitted for investors who purchased securities abroad, inasmuch as those investors are not victims of an offense under Section 10(b) or 10b-5."  *Id.* (quoting *Vilar*, 729 F.3d at 99). The government responds that *Vilar* is inapposite: it concerned conduct that occurred *after Morrison v. National Australia Bank* — which undid the conduct-and-effects test pursuant to which courts had previously determined the securities laws' geographic reach — but *prior* to the 2010 Dodd-Frank Wall Street Reform and Consumer Protection Act, which restored the conduct-and-effects test for securities enforcement actions brought by the government.  Gov't Response to Def. Sur-Reply 1-2, ECF No. 312 (citing *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 267 (2010)); *see* Pub. L. No. 111-203, 124 Stat. 1376, 1865 (2010) (codified at 15 U.S.C. § 78aa(b)(1)-(2)) ("Dodd-Frank Amendments").[11]

In *Morrison*, the Supreme Court held that Section 10(b) only reached "transactions in securities listed on domestic exchanges, and domestic transactions in other securities."  561 U.S. at 267.  In so holding, *Morrison* "undid the conduct and effects tests" that had previously been applied to determine the geographic reach of Section 10(b).  *SEC v. Passos*, 760 F. Supp.

---

[11] The MVRA itself does not limit recovery to victims located in the United States.  *E.g.*, *United States v. Bengis*, 631 F.3d 33, 40-41 (2d Cir. 2011).

3d 95, 116 (S.D.N.Y. 2024). Under that older test, Section 10(b) had prohibited conduct if *either* it "occurred in the United States" or "had a substantial effect in the United States or upon United States citizens." *SEC v. Berger*, 322 F.3d 187, 192 (2d Cir. 2003), *abrogated by Morrison*, 561 U.S. 247.

Within a month of *Morrison*, however, Congress passed the Dodd-Frank Amendments, which "effectively reversed *Morrison*" in the context of government enforcement actions. *Passos*, 760 F. Supp. 3d at 116. Specifically, Congress amended the Exchange Act to provide that the United States may bring an enforcement action for:

> (1) conduct within the United States that constitutes significant steps in furtherance of the violation, even if the securities transaction occurs outside the United States and involves only foreign investors; or
>
> (2) conduct occurring outside the United States that has a foreseeable substantial effect within the United States.

15 U.S.C. § 78aa(b)(1)-(2)). After the Dodd-Frank Amendments, therefore, the government could again prosecute conduct that was captured by the conduct-and-effects test. *See Liu Meng-Lin v. Siemens AG*, 763 F.3d 175, 181 (2d Cir. 2014).

The defendant's reliance on *Vilar* is unavailing, as *Vilar* concerned conduct that occurred post-*Morrison* but pre-Dodd Frank. This case, which post-dated the Dodd-Frank Amendments, is different. As the Court instructed, the jury could find the

26

conspiracy "had a sufficient relationship to the United States" if it "contemplated conduct in furtherance of the conspiracy that would occur in the United States, *even if the contemplated transactions themselves occurred outside the United States.*" *See* Jury Instructions 51-52, ECF No. 199-2 (emphasis added). Here, the trial evidence was more than sufficient to show that the defendant's offense conduct met this standard: among other things, Karony operated SafeMoon from Utah and Virginia, and thus led, no less "contemplated conduct in furtherance of," the conspiracy from the United States.  Trial Tr. 232:2-7 (Smith).

**E.   Joint and Several Liability**

Karony also argues that the Court should "apportion liability among the defendants" rather than order joint and several liability.  Def. Sur-Reply 2.  The government responds that when, as here, "the Court has found that the defendant was the leader and organizer of the criminal conspiracy," liability should be joint and several.  Gov't Response to Def. Sur-Reply 1-2.

Defendant shall be jointly and severally liable for the full loss.  *See United States v. Nucci*, 364 F.3d 419, 422 (2d Cir. 2004) ("It has long been the law of this circuit that the restitution obligation may be ordered to be joint and several.").  Further, the defendant served as the conspiracy's leader, Sent'g Tr. 28, which counsels against apportionment.

*See United States v. Washington*, 408 F. App'x 458, 460 (2d Cir. 2011). In addition, joint and several liability will serve to ensure that victims are made whole as soon as practical. *See United States v. Yalincak*, 30 F.4th 115, 122 (2d Cir. 2022).

## F.    Payment Schedule

Karony also argues that he lacks the ability to pay interest on any restitution awarded. Def. Sur-Reply 1. The government responds that no interest will accrue because the defendant's restrained assets exceed the amount of restitution sought. *See* Gov't Response to Def. Sur-Reply 2.

Restitution shall be due immediately. 18 U.S.C. § 3572(d)(1); *see Nucci*, 364 F.3d at 422. To determine "the manner in which, and the schedule according to which, the restitution is to be paid," the court must consider "the financial resources and other assets of the defendant," among other factors. 18 U.S.C. § 3664(f)(2)(A); *see United States v. Porter*, 90 F.3d 64, 68 (2d Cir. 1996) (affirming restitution award payable immediately where defendant had "present means" to pay). "The defendant bears the burden of demonstrating his financial resources . . . ." *Schwamborn*, 467 F. App'x at 37.

The defendant's financial declaration shows that he has the ability to pay restitution in full immediately. *See* Karony Financial Decl. ¶ 2, ECF No. 224-1 (listing $4 million in funds subject to the asset restraint). Relevant here, the Court

previously restrained over $4 million in certain Citibank accounts belonging to the defendant in anticipation of any future restitution awarded.  Asset Restraint Order 2, ECF No. 220; Mem. & Order Continuing Asset Restraint 10, ECF No. 235; Amended Restraint Order, ECF No. 242.  Thus, defendant shall make a "single" payment in the full amount of the restitution ordered.  18 U.S.C. § 3664(f)(3)(A); *see Porter*, 90 F.3d at 68. The Court accordingly rejects Karony's argument that he cannot pay interest, as none will accrue here.

**G.    Government Witness J.G.'s Expenses**

The government also seeks $4,038 in restitution for J.G. — a government witness and victim-purchaser who testified at trial, and whose identity is known to the defense — for lost income and expenses incurred as a result of testifying.  Gov't Ltr. 2.  The defendant has not contested this figure, and the Court finds it justified.  *E.g.*, *United States v. Maynard*, 743 F.3d 374, 381 (2d Cir. 2014) ("The victim expenses that are recoverable . . . [include] expenses the victim was required to incur to advance the investigation or prosecution of the offense.").

**H.    Stay Pending Appeal**

The defendant has also requested that the Court stay the restitution order pending appeal.  Def. Ltr. Requesting Stay, ECF No. 317; *see* Not. of Appeal, ECF No. 289.  The

defendant's request is denied.

Under Rule 38(e)(1), the court "may stay — on any terms considered appropriate — any sentence providing for restitution."  Fed. R. Crim. P. 38(e)(1).  In determining whether to stay a sentence, courts consider the movant's likelihood of success on appeal and the risk of irreparable harm, among other factors.  *See United States v. Grote*, 961 F.3d 105, 122-23 (2d Cir. 2020).

Karony has not made the required showing.  Among other things, he is unlikely to succeed on appeal: the government has provided a conservative estimate of the restitution due, and has furnished the "reasonable approximation" required.  *Gushlak*, 728 F.3d at 196; *see supra* Section II.B.  Nor has he established irreparable harm, as payment of a monetary penalty alone, without a showing of the financial hardship that payment would impose, "does not constitute irreparable harm."  *United States v. Rahmankulov*, No. 20-CR-653, 2025 WL 326495, at *5 (S.D.N.Y. Jan. 28, 2025) (quoting *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999)).  Accordingly, the request is denied.

## I.   Forfeiture of Substitute Assets

As noted above, the court previously restrained over $4 million in four Citibank accounts belonging to the defendant.  Amended Order, ECF No. 242.  Karony has requested

the Court lift the asset restraint as to funds that exceed the restitution award, which total "approximately $700,000," and direct the government to return those funds (the "excess funds") to the defendant.  Def. Ltr. Requesting Stay 2.  The government opposes that motion and requests that the excess funds be forfeited as a substitute asset.  Gov't Mot. for Forfeiture of Excess Funds as Substitute Asset, ECF No. 319.  The defendant's motion is denied, and the government's is granted.

The Court previously granted a version of the government's Preliminary Order of Forfeiture.  *See* Prelim. Order of Forfeiture ("Forfeiture Order"), ECF No. 277.  That order required the defendant to forfeit $7,571,699.00 in assets "constituting, or derived from, proceeds obtained directly or indirectly as a result of the defendant's" offenses of conviction.  *Id.* at 1-2.  At sentencing, the Court held that the government carried its burden to establish the amount of the Money Judgment, and the Forfeiture Order became final as to the defendant.  Sent'g Tr. 89; *see* GX-6006, at 53.

The Forfeiture Order provided that if the Money Judgment "is not satisfied, the [government] may seek to enforce this [order] against any other assets of the defendant up to" the "outstanding balance" of the Money Judgment.  *See* Forfeiture Order 3 (citing 21 U.S.C. § 853(p)).  Section 853(p) states that if, due to "any act or omission of the defendant," any property

31

subject to forfeiture that "(A) cannot be located upon the exercise of due diligence; [or] (B) has been transferred or sold to, or deposited with, a third party," the court "shall order the forfeiture of any property of the defendant" up to the value of the property the government cannot locate.  *See* 21 U.S.C. § 853(p)(1)-(2); *see also* Fed. R. Crim. P. 32.2(e)(1) ("On the government's motion, the court may at any time enter an order of forfeiture or amend an existing order of forfeiture to include property that . . . is substitute property that qualifies for forfeiture under an applicable statute.").  The government must show its due diligence by a preponderance of the evidence, which it can do through an expert affidavit "explaining the investigation and efforts made to locate the directly forfeitable property."  *United States v. Christie*, 249 F. Supp. 3d 739, 743 (S.D.N.Y. 2017).

The government has met its burden twice over, showing both its "exercise of due diligence" and that the defendant transferred forfeitable property to third parties.  Agent Jeffrey Petrower, the government's asset-tracing expert at trial, furnished a declaration attesting to the government's effort to locate the assets subject to forfeiture.  *See* Decl. of Agent Jeffrey Petrower ¶ 7 ("Petrower Decl."), ECF No. 319-1.  Petrower asserts that "[d]espite the exercise of due diligence, including research conducted in various financial databases, the

32

government has been unable to locate" any of the assets subject to the Money Judgment.  *Id.* ¶ 9.  Petrower's "investigation further revealed" that the defendant deposited over $1 million from the liquidity pool into a personal account, which was later "withdrawn or dissipated."  Petrower Decl. ¶ 12.  Petrower also cites the tracing exhibit he prepared for trial.  *Id.* ¶ 10.  That exhibit showed that the defendant transferred over $4 million in assets from the liquidity pool to certain named relatives.  *Id.; see* GX-6006, at 53.  Accordingly, the Court finds that Petrower's declaration and evidence introduced at trial, taken together, carry the government's burden.

The defendant argues that the restrained assets "are not eligible" as substitute assets because "over $12 million in funds the government asserts are tainted are accessible" in the SafeMoon LLC bankruptcy proceeding.  Def. Ltr. Requesting Stay 2.  That argument is unavailing.  Under Section 853, the government may obtain substitute assets when it has exercised "due diligence" but cannot locate the assets subject to forfeiture.  *United States v. Romeo*, 136 F.4th 372, 378 (2d Cir. 2025).  The estate funds in the bankruptcy proceeding, however, are not subject to forfeiture: the Money Judgment applied to assets the *defendant*, not the SafeMoon entity, "obtained directly or indirectly" due to his offenses of conviction.  Forfeiture Order 1-2.  In any case, the government has shown

33

that the defendant transferred to relatives over $4 million in assets subject to forfeiture.  It can therefore seek up to that amount as a substitute asset on this basis alone — and here seeks substantially less.  *See* 18 U.S.C. § 853(p)(1)(B).

### III. Conclusion

For the foregoing reasons, Karony is ordered to pay restitution in the amount of $3,347,046.66 to the victims named, and in the amounts listed, in Exhibit A.  Exhibit A will be filed under seal with the Clerk of Court because it contains the names of victims and other identifying information.  A judgment reflecting this amount shall issue forthwith.  Separately, the government's motion in support of its preliminary order of forfeiture of substitute assets is granted, as set forth in the separately docketed Preliminary Order of Forfeiture as to Substitute Asset.  ECF No. 322.

SO ORDERED.

_/s/ Eric Komitee_____
ERIC KOMITEE
United States District Judge

Dated:    May 11, 2026
          Brooklyn, New York

34